Linda J. MILES, Appellant,

v.

Charles B. WERLE, Respondent.

No. WD 54921.

Missouri Court of Appeals, Western District.

Oct. 13, 1998.

Howard D. Lay, Kansas City, for appellant.

Thomas C. McGiffen, Liberty, for respondent.

Before HANNA, P.J., LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

LAURA DENVIR STITH, Judge.

Appellant Linda Miles appeals the trial court's refusal to enforce an antenuptial agreement and its division of marital property. She argues that the trial court erred in holding that the antenuptial agreement was insufficiently definite to allow the court to give the terms an exact meaning, and was therefore unenforceable. She also asserts that the trial court erred in making an unequal division of marital property and debt which favored the Respondent, Charles Werle, and in refusing her requests to off-set the amounts to which he is entitled from her profit-sharing plan by the amounts he is ordered to pay to her, or to secure the amounts he is ordered to pay to her. We find that the antenuptial agreement was enforceable on the particular facts of this case and we reverse and remand for further proceedings in accordance with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Linda Miles and John Werle entered into an antenuptial agreement on September 9, 1992, and were married three days later. The agreement provided that neither spouse would acquire an interest in property owned or possessed by the other prior to the marriage, or in any increase in the value of that property. It is undisputed that Mr. Werle had no assets at the time of the marriage. Ms. Miles did have some assets, a list of which was attached to the antenuptial agreement. The most valuable of these was (1) her residence, which the list valued at $60,-000. In addition, she listed: (2) a 1992 Grand Am automobile, (3) bank accounts at Commerce Bank of Kansas City, (4) 940 shares of Yarco Second Mortgage Company Stock, (5) an HR10 profit-sharing plan at her employer, Van Osdol, Magruder, Erickson & Redmond, P.C., I.D. # 43–1565398, (6) life insurance in her name through her employer, (7) any lawsuits pending at the date of the agreement, (8) a General Motors pension plan at the date Don G. Miles retires or any accrued benefits, and (9) depression glass collected prior to the marriage. Ms. Miles asserts that her motivation for the antenuptial agreement was a desire to preserve her interest in her profit-sharing plan for her two children born of a previous marriage. There is no claim that this list of assets attached was not accurate, and everything included on the list was Ms. Miles' separate property at the time of the marriage. It is also conceded that the agreement provided that, if the marriage were dissolved, "such property as may be accumulated by the parties during the term of the marriage and by the joint efforts of the parties shall be divided equally between them." In other words, the antenuptial agreement did not waive either spouse's interest in marital property except as to any increase in the value of assets owned prior to the marriage.

Shortly after the marriage, the parties executed an ERISA waiver of Mr. Werle's rights to Ms. Miles' pension, as an addition to their antenuptial agreement. There is no claim

that this waiver was not made in accordance with relevant federal law.

During their marriage, Ms. Miles continued her employment at a law firm, earning around $30,000 per year. By contrast, Mr. Werle worked only occasionally, with varied levels of income. Although Mr. Werle reported little income, at trial he testified that he had made $60,000.00 of unreported income in a six-month period. At one point, Ms. Miles was required to bail Mr. Werle out of jail for his failure to pay child support for his children from a previous marriage. Mr. Werle also exhibited violent behavior during their marriage, including physical and verbal abuse.

The parties separated on October 7, 1996, but the violence continued. On November 27, 1996, Ms. Miles obtained a Full Order of Protection against Mr. Werle. The evidence shows that on at least two occasions Mr. Werle violated this order. As a result, on January 30, 1997, Mr. Werle pleaded guilty to criminal aggravated stalking charges and third-degree assault charges against Ms. Miles. Ms. Miles further testified that Mr. Werle continued to assault her, follow her, and harass her with threatening phone calls and notes. As a result of Mr. Werle's behavior, Ms. Miles testified that, at the suggestion of the court, she agreed to move away from her home for a few months. This caused Ms. Miles to incur substantial expenses, which she estimated to be approximately $7,955.00, in order to relocate her life for the period of time during which she was threatened by Mr. Werle's behavior. In addition, Mr. Werle used her credit cards during this period without her permission, forging her signature and ringing up a total debt of $6,700.00 which she was forced to pay.

Ms. Miles filed a Petition For Dissolution Of Marriage in which she requested the court to enforce the antenuptial agreement. Mr. Werle submitted a Motion To Determine The Enforceability Of The Antenuptial Agreement in which he argued the antenuptial agreement was invalid and unenforceable because: (1) he was not represented by an attorney or afforded legal counsel prior to the execution of the agreement, (2) the property list did not fully disclose the value of the

property it listed and Mr. Werle did not have personal knowledge of its value, and (3) the agreement was executed in the office where Ms. Miles worked and was notarized by a receptionist in that office.

The trial court noted that *In Re Marriage of Lewis,* 808 S.W.2d 919, 923 (Mo.App.1991), states that "a valid agreement requires full disclosure of both spouses' legal rights and the nature and extent of the property of the other." *Id.* at 923. The trial court concluded that, in the instant case, the antenuptial agreement was insufficiently definite as to the value of the property the parties were disclaiming, in that Mr. Werle's property list was left blank and Ms. Miles' list set forth a value for only one of the nine classes of property it listed, i.e., the residence. The court therefore refused to enforce the agreement.

Because most of the items on Ms. Miles' list were her separate property, and there was no evidence that these items had increased in value over the marriage, the court's refusal to enforce the antenuptial agreement had no effect on the distribution of these items—they were distributed to her as her separate property, just as they would have been absent the agreement. The same applies to the money Ms. Miles had accumulated in her profit-sharing plan up to the time of the marriage. Due to the court's refusal to enforce the antenuptial agreement, however, the additional amounts earned in Ms. Miles' profit-sharing plan during the four years of the marriage, totaling approximately $20,688.00, were distributed as marital property. The court awarded $10,344.00 of this increase to Mr. Werle and $10,344.00 to Ms. Miles. The court also ordered Mr. Werle to pay Ms. Miles $6,700.00 to reimburse her for his unauthorized use of her credit cards after their separation. It also divided the parties' other marital and non-marital property based on lists provided by each spouse.

Ms. Miles requested that the court off-set the value of this and other property which it awarded to Mr. Werle by the $6,700.00 awarded to Ms. Miles for the unauthorized credit card debt accumulated by Mr. Werle. Alternatively, she asked the court to secure the $6,700.00 debt, since otherwise she feared

he would take bankruptcy and she would end up owing him part of her pension while he would never pay her his debt to her. The court refused this request. Ms. Miles also asked the court to award her the $7,955.00 expended when she had to obtain the protective order and live separately during the time her safety was threatened by Mr. Werle. The court recognized in its judgment that she claimed this amount in relocation and related expenses to avoid Mr. Werle during the times of harassment and physical attacks, but did not specifically rule on the distribution of this amount. The court merely crossed out the grid sections detailing these expenses in making its distribution of marital property. We presume the court thus determined not to award her these costs. Ms. Miles appeals.

## II. STANDARD OF REVIEW

The standard of review is that applicable to court-tried cases: we affirm the trial court's decree unless there is no substantial evidence to support the decision, the decision is against the weight of the evidence, or the decision erroneously declares or misapplies the law. *Crews v. Crews,* 949 S.W.2d 659, 663 (Mo.App.1997), *quoting, Allen v. Allen,* 927 S.W.2d 881, 885 (Mo.App.1996). The party challenging the dissolution decree has the burden of demonstrating error. *Id.* The trial court's division of marital property will only be disturbed if the distribution of marital property is so "'heavily and unduly weighted in favor of one party as to amount to an abuse of discretion.'" *Id.,quoting, Dodson v. Dodson,* 904 S.W.2d 3, 6 (Mo.App. 1995).

## III. THE ANTENUPTIAL AGREEMENT IS ENFORCEABLE

Ms. Miles argues that the trial court erred in finding the antenuptial agreement insufficiently definite to be enforceable. In Missouri, to be valid and enforceable an antenuptial agreement must (1) be entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure, and (2) must not be unconscionable. *Ferry v. Ferry,*

586 S.W.2d 782, 787 (Mo.App.1979). Ms. Miles asserts that the agreement met the disclosure requirements of *Lewis* in that Mr. Werle's property list was blank simply because he neither owned nor possessed any assets, and that she listed all of her property, and the values for the classes of property described on her list were readily attainable from commonly available public sources or were of only nominal value, and the agreement conscionable. Conversely, Mr. Werle asserts that the agreement both failed to provide full disclosure as required by *Lewis,* and also failed to establish consideration or to meet the conscionability requirements set out in *Nedblake v. Nedblake,* 682 S.W.2d 852 (Mo.App.1984), and *Estate of Tegeler,* 688 S.W.2d 794 (Mo.App.1985). We address each requirement in turn.

### A. The Adequacy of Disclosure.

The requirement that an antenuptial agreement be entered into freely and knowingly, with understanding, has been interpreted by the courts to involve a subjective evaluation of the fairness surrounding the execution of the agreement. Factors which courts have considered relevant include the signatories' access to independent counsel, the amount of time available to revise the agreement, the bargaining positions of each spouse in terms of age, sophistication, education, employment, and experience, and whether their assets were fully disclosed. *McMullin v. McMullin,* 926 S.W.2d 108, 111 (Mo.App.1996); *In re Estate of Reinsmidt,* 897 S.W.2d 73, 77 (Mo.App.1995).

Here Mr. Werle asserts a lack of full disclosure.[1] "Full disclosure" requires that each spouse reveal the nature and extent of their property sufficiently so that the other may make a meaningful decision whether to waive whatever rights they would otherwise acquire in that property through the marriage. *Lewis,* 808 S.W.2d at 923. There is no absolute rule as to what constitutes sufficient disclosure; what is sufficient varies with the circumstances of each case. *Id.* For this reason, while a detailed disclosure is preferable, lack of detail does not

---

1. He also asserts a lack of counsel, while this is relevant, we do not find this dispositive on the facts of this case in which neither party had or sought counsel.

automatically invalidate an agreement if the disclosure which was given allowed a meaningful decision to be made. *Reinsmidt,* 897 S.W.2d at 78. *Compare Darr v. Darr,* 950 S.W.2d 867, 871 (Mo.App.1997) (disclosure was sufficient under totality of circumstances even though it disclosed only 88.2 % of husband's monthly income where wife had been his social director and was familiar with his income and expenses, and she was given a $500 stipend and expensive gifts), *with Lewis,* 808 S.W.2d at 923 (agreement invalid where wife was only told types of property husband held and did not know extent of his corporate holdings or extent of equity in commercial real estate he owned), and *Ferry,* 586 S.W.2d at 787 (agreement invalid where wife confused about need for it, it was prepared by husband in consultation with attorney but wife was not represented, she had only a short period to consider it and did not understand agreement's importance, she was told that provisions she objected to could be changed later, and some of assets were not fully disclosed and no values of assets were given).

The facts of *Reinsmidt* are the most similar to this case. In *Reinsmidt,* both the husband and the wife met with the husband's attorney to discuss an antenuptial agreement since it was a second marriage for both and each had children from previous marriages. The wife was advised to retain her own counsel, but she refrained from doing so. The husband's attorney drew up the agreement, and the wife had it for two weeks before ultimately signing it. Attached to the antenuptial agreement was a list of the husband's assets. While the list set out a complete description of all the assets held by husband, it did not set out a corresponding value for them. The wife's assets at the time of the agreement consisted of a 1971 Dodge Aries and a "minimal" checking account. The husband died, and the wife challenged the validity of the antenuptial agreement based on an alleged lack of full disclosure. *Reinsmidt,* 897 S.W.2d at 75.

The court found that the husband did not conceal any of his assets, that the wife was familiar with the real estate listed, that she had lived at one of the addresses for some time, and that she could have readily ascertained its value, as well as the values of his other assets, which included a promissory note and stocks. *Id.* at 78. In addition, the antenuptial agreement signed by the wife stated that she acknowledged the nature and extent of husband's holdings. The court found that, together, this evidence sufficed to support the trial court's finding that there was full disclosure. *Id.*

Here, as in *Reinsmidt,*while the disclosure was not as detailed as would be preferred, it was adequate to meet the full disclosure requirement, in that Mr. Werle was presented with sufficient information in order to make a "meaningful decision" regarding his waiver of any interest in Ms. Miles' property. Both parties have at least high school educations and the antenuptial agreement states that each party understood the agreement and that each appended property list constituted sufficient disclosure. All agree that the list contained all of each party's assets. Mr. Werle simply had no assets. Although the list did not state how much equity Ms. Miles had in her home, it listed the full value of the residence, thus overstating rather than understating her interest. This could not have been misleading, and favors a finding of full disclosure.

Against such a finding is the fact that the agreement was executed only three days prior to the wedding and neither party was represented by an attorney in the matter, and no values were given for Ms. Miles' other assets. In other circumstances, where these assets had a significant value or had a greatly increased value at the time of dissolution, the failure to list their value could be sufficiently misleading to require a finding of lack of full disclosure. Each case must be examined on its own facts, however, to determine whether the agreement was misleading or whether there was fraud or overreaching. *See Estate of Youngblood v. Youngblood,* 457 S.W.2d 750 (Mo. banc 1970) (antenuptial agreement valid despite fact it did not itemize each parties assets and their values because the holdings were not complex and both parties were from the same community so that they were familiar with the other's property).

Here, none of the eight assets listed without values, other than the profit-sharing plan, were shown to have any substantial value. They were of a simple or uncomplicated nature and were either of nominal value or had readily identifiable values which could be determined by reference to public sources. Most importantly, with the exception of the profit-sharing plan, the items were of little consequence in determining the sufficiency of disclosure because they were not assets to which Mr. Werle would have been entitled even if an antenuptial agreement had not been signed. They were and remained Ms. Miles' separate property, and there was no showing that they increased in value during the marriage. This is thus unlike some other cases in which a spouse's assets have substantially increased in value during the marriage, so that the other spouse is deprived of assets of substantial value he or she would otherwise have. Mr. Werle did not in fact lose property he otherwise would have had by signing the antenuptial agreement as to these assets. *See Heady v. Heady,* 766 S.W.2d 489 (Mo.App.1989) (failure of husband to disclose the value of certain personal property items was found to be unworthy of serious consideration because they were of nominal value).

This is not true as to the profit-sharing plan, which was valuable and did increase in value. However, Mr. Werle's only interest was in the increase in its value after the marriage, and there is no claim she could have disclosed that before the marriage. Moreover, after the parties were married, Mr. Werle voluntarily signed a separate ERISA waiver of rights in Ms. Miles' profit-sharing plan. In these circumstances, the record shows there was sufficient disclosure of the nature, extent and amount of Ms. Miles' property for Mr. Werle to enter into the contract with knowledge of what he stood to gain or lose.

### B. Conscionability of Agreement.

Once a court determines that an antenuptial agreement meets the disclosure requirement, the court must consider whether it is nonetheless so unconscionable that the court should not enforce it. In making this determination, the court reviews the substantive fairness of the agreement. For this reason, *Ferry* described the court's conscionability inquiry as protection for the *"unwary and ill-informed spouse." Ferry,* 586 S.W.2d at 786 (emphasis added).

■ An antenuptial agreement will be found to be unconscionable when "the inequality [is] so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *McMullin,* 926 S.W.2d at 110. Such unconscionability has been found where, for instance, the agreement attempts to totally take from one of the spouses his or her presumed right to marital property. *See McMullin* at 111; *Ferry,* 586 S.W.2d at 787.

By contrast, where an antenuptial agreement permits each spouse to retain a share of the marital property, albeit a disproportionately small one, courts are more likely to uphold and enforce the agreement. *Darr,* 950 S.W.2d at 871; *Reinsmidt,* 897 S.W.2d at 79; *Gould v. Rafaeli,* 822 S.W.2d 494, 494 (Mo.App.1992).

■ In the present case, the antenuptial agreement did not seek to totally prevent Mr. Werle from obtaining the marital assets which he would have obtained absent the agreement. To the contrary, the agreement basically provided only that what each spouse brought into the marriage as separate property would remain their own separate property. It specifically stated that, if the marriage were dissolved, then "such property as may by accumulated by the parties during the term of the marriage and by the joint efforts of the parties shall be divided equally between them." The only exception to this rule was the provision that any increase in value of separate property, including Ms. Miles' profit-sharing plan, would remain hers. As noted above, Ms. Miles testified that the reason why the profit-sharing plan was treated separately was that she wanted to use it to provide for her two children born of a prior marriage. The amount of the profit-sharing plan affected by this agreement is $20,644.00.

Although Mr. Werle argues that the enforcement of the agreement would be uncon-

scionable because it would leave him with nothing, we disagree. If considered as of the time the agreement was made, the terms of the agreement cannot be considered unconscionable. Mr. Werle retained his rights to the accrual of marital property other than the profit-sharing plan. The agreement is not unconscionable simply because it attempts to make reasonable provision for the financial protection of a spouse's children.

Similarly, if considered as of the date of the dissolution, the agreement is also not unconscionable. Again, the only marital property which was shown to be affected by the agreement was the profit-sharing plan, and the total dollars at stake were $20,644.00. The court divided the personal property according to the parties' designation of it as marital or separate. Moreover, as discussed above, Mr. Werle provided almost nothing during the marriage, and engaged in serious and egregious marital misconduct which put Ms. Miles at personal risk and which cost her considerable expense.

We therefore hold that the trial court erred in refusing to enforce the antenuptial agreement. On remand, the court shall enforce the agreement and shall award all interest in the profit-sharing plan to Ms. Miles.

## IV. PROPERTY DISTRIBUTION

■ Ms. Miles also claims the court erred by including within her award of marital property items which should have been classified as non-marital property. The lists, or grids, utilized by the courts in making the property allocations show that the parties were in conflict as to the appropriate classification of the some of the items in question. They also show that Ms. Miles believed some of the items which the court characterized as marital were in fact her separate property.

However, we find no evidence in the record to show on what basis Ms. Miles thinks the items should be considered non-marital, or to show why the court could not have believed that these items were marital. While, as Ms. Miles notes, in handwritten notes the court originally listed these items as non-marital, we are cited to no authority making such tentative notes binding. It is evident from the court's judgment, and from its denial of reconsideration once Ms. Miles noted the discrepancy between the notes and the final judgment, that the court ultimately determined that these items were marital. We cannot say on this record that the court erred in so ruling. However, since we remand for other reasons, the court is free to reconsider this issue on remand if additional relevant evidence is presented.

## V. OFF–SET/SECURITY FOR JUDGMENT

■ The court found that Mr. Werle had run up $6,700.00 in unauthorized charges on Ms. Miles' credit cards. The court ordered Mr. Werle to repay Ms. Miles this amount. However, the debt was unsecured, and thus, Ms. Miles notes, Mr. Werle may be able to discharge it in bankruptcy, leaving Ms. Miles to pay the bills. Ms. Miles therefore requested the court to off-set the $10,344.00 in interest it granted Mr. Werle in the profit-sharing plan with his $6,700.00 debt to her. Because we have held above that the court erred in refusing to enforce the antenuptial agreement, we need not reach the question whether the court erred in failing to set off the $6,700.00 debt owed by Mr. Werle against his interest in the profit-sharing plan; he now has no such interest.[2]

Ms. Miles also contends that the court erred in failing to direct Mr. Werle to repay

---

2. As Ms. Miles notes, the doctrine of off-setting judgements is well-grounded in Missouri law. *Riddle v. Dean Machinery Co.*, 564 S.W.2d 238, 250 (Mo.App.1978); *Mills v. First National Bank of Mexico*, 697 S.W.2d 264, 266 (Mo.App.1985) (judgments concerning claims and cross claims are generally off-set); *Eastern Atlantic Trans. v. Dingman*, 727 S.W.2d 418, 423 (Mo.App.1987) (defendant may plead a general denial as well as a set-off claim). However, whether to allow a set-off in a particular case is usually left to the discretion of the trial court judge to divide the marital property. *Corder v. Corder*, 546 S.W.2d 798 (Mo.App.1977); *Poland v. Poland*, 895 S.W.2d 670 (Mo.App.1995). Off-set is governed by the rules of equitable procedure. *Helstein v. Schmidt*, 229 Mo.App. 275, 78 S.W.2d 132, 135 (1935). In order for judgments to be qualified for off-set, the demands must be "mutual and subsisting between the same parties, and due in the same capacity or right." *Payne v. Payne*, 695 S.W.2d 494, 497 (Mo.App.1985); *Mercantile Trust Co., Nat. Ass'n. v. Mosby*, 623 S.W.2d 22, 24[5] (Mo.App.1981).

her most or all of the $7,955.00 she claimed she had to spend as a result of his physical violence to her. The court recognized that she had these expenses, but simply crossed them out on the property grid without any explanation as to why it did not factor in any of this expense in dividing the marital property and in deciding whether its allocation of the marital debt should be considered in the nature of maintenance and so non-dischargeable in bankruptcy.

 To the extent that the court so ruled because it believed it could not consider these expenses, it was incorrect. Section 452.330 states that in dividing marital property, the court should consider the economic circumstances of the parties at the time of division, the contribution of each party to the marriage, the value of the nonmarital property set apart to each spouse, and the conduct of the parties during the marriage. § 452.330, RSMo 1994. Moreover, it is well-settled that "if there is substantial evidence that one spouse squandered marital properties, the trial court is authorized to order reimbursement." *In re Marriage of Layton*, 687 S.W.2d 214, 216 (Mo.App.1984). *See also Lawrence v. Lawrence*, 938 S.W.2d 333, 338 (Mo.App.1997); *Calia v. Calia*, 624 S.W.2d 870, 872 (Mo.App.1981). These principles clearly supported consideration of these expenses when allocating marital property and debt here and when deciding whether and how to secure the debt and to make it non-dischargeable in bankruptcy.

 To the extent that the court was aware that it had the discretion to consider these expenses in allocating property and debt, but decided without explanation to disallow them entirely, it abused its discretion on the particular facts shown by the record in this case. That record shows, on the one hand, that Mr. Werle claimed to have little non-marital property, and that the specific marital property set aside to him has little ready cash value. On the other hand, it is undisputed that Mr. Werle's conduct during the marriage was violent and improper; that he contributed almost nothing to the marriage; that he charged $6,7000.00 to his wife's account; that his wife had to spend marital assets to bail him out of jail when he

failed to pay child support for a child of another marriage; and that she had to expend up to $7,955.00 in marital resources on debts incurred due to his misconduct and violence toward her. Finally, despite his claims of poverty, Mr. Werle admitted that he had earned $60,000.00, not reported on his tax returns, in a six-month period and that he made a lot of cash income he did not report.

In these circumstances, and in light of the fact that Mr. Werle's misconduct is responsible for most of the expenses at issue, the trial court should have considered Ms. Miles' expenses and determined their reasonableness before allocating marital property, and in deciding whether the debt which it allocated to Mr. Werle should be secured or otherwise made non-dischargeable in bankruptcy.

For these reasons, we reverse so much of the court's order as invalidated the antenuptial agreement, as awarded $10,344.00 of the profit-sharing plan to Mr. Werle, and as denied all relocation and similar expenses incurred due to Mr. Werle's misconduct, and remand for further proceedings in accordance with this opinion.

HANNA, P.J., and EDWIN H. SMITH, J., concur.