**Terri L. Nelson KING, Appellant,**

v.

**Cordell James KING, Respondent,**

**Vernon KING, Defendant.**

**No. WD 58514.**

Missouri Court of Appeals,
Western District.

Oct. 30, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 26, 2001.

Application for Transfer Denied
Feb. 26, 2002.

Patricia L. Hughes, Liberty, for appellant.

Thomas C. McGiffin, Liberty, for respondent.

Thomas E. Hankins, Gladstone, for defendant.

Before PAUL M. SPINDEN, Chief Judge, Presiding, HAROLD L. LOWENSTEIN, Judge, ROBERT G. ULRICH, Judge, PATRICIA A. BRECKENRIDGE, Judge, JAMES M. SMART, JR., Judge, JOSEPH M. ELLIS, Judge, EDWIN H. SMITH, Judge, VICTOR C. HOWARD, Judge, THOMAS H. NEWTON, Judge, RONALD R. HOLLIGER, Judge, and LISA WHITE HARDWICK, Judge.

ROBERT G. ULRICH, J.

Terri Nelson King (Wife) appeals the trial court's judgment of dissolution dissolving her marriage to Cordell King (Husband) and distributing property. She claims that the trial court erred in (1) finding that the antenuptial agreement was valid, (2) setting aside certain property acquired during the marriage as Husband's separate property, (3) failing to award her attorney's fees, and (4) failing to restore her maiden name. The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded with directions.

Husband and Wife were married on May 31, 1994. This was the second marriage for Husband, who was 41 years old,

and the first marriage for Wife, who was 26 years old. No children were born of the marriage. Prior to the marriage, Husband and Wife entered into an antenuptial agreement in 1994, which was drafted by Husband's attorney and reviewed by Wife's attorney. In the antenuptial agreement, Wife disclosed assets consisting of bank accounts, a retirement account, an automobile, and personal property valued at $18,250. Husband disclosed $245,000 in assets consisting of two homes, bank accounts, an IRA, and automobiles. After the couple was married, Husband went to work for his father, Vernon King, at his father's company, King Farms. King Farms is a business that buys and sells used heavy equipment such as bulldozers, road graders, and tractors.

The couple separated on March 10, 1998, and Wife filed her petition for dissolution of marriage on November 18, 1998. The principal dispute at trial was whether Husband owned King Farms at the time the antenuptial agreement was signed. The business was not disclosed as Husband's asset in the agreement. Wife claimed that Husband willfully failed to disclose in the antenuptial agreement that he was the sole proprietor of King Farms and had been since 1991, three years prior to the marriage. Wife testified that before she signed the antenuptial agreement, she suspected Husband had an ownership interest in King Farms. She claimed that when she asked him about it, he told her that it was none of her business. Husband testified that he did not own the business when he signed the antenuptial agreement and that he did not own it at the time of trial. Because the ownership of the business was at issue, the court permitted the intervention of Husband's father, Vernon King, who testified that he was the sole proprietor of the business.

In its judgment of dissolution, the trial court found that Husband's father was the sole owner of King Farms and that Husband did not have an ownership interest in the business that required disclosure in the antenuptial agreement. Accordingly, the trial court found that the antenuptial agreement was valid. The court then set aside to each that person's separate property. Wife received certain furniture as her separate property. Husband received two houses, property known as Gould Farm, an American Century account, a Kemper Funds account, bank accounts, and certain furniture as his separate property. The court then divided the marital property and debt. Wife was awarded a $500 bank account and $23,200 in personal property and was ordered to pay $26,657 in debt plus her attorney's fees totaling $11,158. Husband was awarded $1000 in marital property and was ordered to pay $11,600 in debt plus his attorney's fees totaling $5950. Husband was also ordered to pay Wife $4300. This appeal by Wife followed.

## STANDARD OF REVIEW

The judgment in a dissolution proceeding will be affirmed on appeal unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Miles v. Werle*, 977 S.W.2d 297, 301 (Mo.App. W.D. 1998). A judgment will be reversed on the ground that it is against the weight of the evidence only with caution and a firm belief that the judgment is wrong. *Kennedy v. Kennedy*, 969 S.W.2d 310, 313 (Mo.App. W.D.1998). "Weight of the evidence" refers to the probative value of the evidence and not the quantity of the evidence. *In re Marriage of Lewis*, 808 S.W.2d 919, 922 (Mo.App. S.D.1991). The trial court has broad discretion in distributing property,

and an appellate court will interfere only if the division is so unduly weighted in favor of one party as to constitute an abuse of discretion. *Miles,* 977 S.W.2d at 301. "An abuse of discretion will be found only if the award is so arbitrary or unreasonable that it indicates indifference and lack of proper judicial consideration." *Silcox v. Silcox,* 6 S.W.3d 899, 905 (Mo. banc 1999). The party challenging the judgment of dissolution has the burden of demonstrating error. *Miles,* 977 S.W.2d at 301.

 An appellate court must review the evidence in a light most favorable to the trial court's decision. *Darr v. Darr,* 950 S.W.2d 867, 870 (Mo.App. E.D.1997). Factual determinations are the prerogative of the trial court, and conflicts in the evidence are for the trial court to resolve. *In re Estate of Reinsmidt,* 897 S.W.2d 73, 76 (Mo.App. E.D.1995). Thus, the trial court has the discretion to determine the credibility of the witnesses, accepting or rejecting all, part, or none of the testimony it hears. *Jones v. Jones,* 10 S.W.3d 528, 532 (Mo.App. W.D.1999).

## I. ANTENUPTIAL AGREEMENT

In the first two points addressed in this appeal, Wife claims that the trial court erred in enforcing the antenuptial agreement. She first argues that the agreement was entered into without full disclosure of Husband's ownership interest of the business King Farms or, alternatively, his right to keep any profits generated by the business. Wife also argues the antenuptial agreement was unenforceable because it was unconscionable.

### A. Ownership Interest in King Farms

Wife first argues that Husband failed to fully disclose his interest in the King Farms business. Specifically, Wife contends that Husband had an ownership interest in King Farms that he should have disclosed in the antenuptial agreement and that the trial court's finding that Husband's father was the sole owner of King Farms was against the weight of the evidence.

 An antenuptial agreement contemplating dissolution of marriage is not against public policy and can be valid. *Darr,* 950 S.W.2d at 870. To be valid and enforceable, an antenuptial agreement (1) must be entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure, and (2) must not be unconscionable. *Miles,* 977 S.W.2d at 301.

 To support her claim that Husband owned King Farms at the time of the execution of the antenuptial agreement and was required to disclose his interest in the antenuptial agreement, Wife provided several forms of evidence. She introduced Husband's tax returns showing that every year since 1991, Husband reported King Farms' net profit as his income in his capacity as the sole proprietor of the business. Wife also introduced the tax returns of Husband's father that showed he did not report the business's profit as his income. Both Husband's and Husband's father's tax returns since 1991 showed that rental of the real property upon which the business is located was paid by the business to Husband's father. The amount paid each year was $24,000 until 1998, after Wife filed her petition for dissolution of marriage, when the annual rent increased to $77,395. Additionally, Wife presented documentary evidence that Husband signed and filed a Missouri tax registration application as owner of King Farms, that payments to Husband from the business account were shown as owner's draws, and that Husband filed an application with the State of Missouri as owner of King Farms for dealer license plates.

Finally, Wife presented the testimony of the accountant of Husband and Husband's father, whose testimony was conflicting. He testified that the business was transferred from Husband's father to Husband in 1991 when Husband gave his father a note for $45,000 and contributed $11,451 to the business. The accountant said that Husband had "paid down" the note to $25,000. The accountant, however, also testified that he never saw the $45,000 note from Husband to Husband's father and that he did not know who owned King Farms. Additionally, the King Farms "trial balance sheet," which was referred to by the accountant and offered as an exhibit by Wife and which depicted business events from January 1, 1992, through December 31, 1992, showed the note as a note owed by the company to Husband's father. It also showed that the $11,451 contributed by Husband to be a loan from Husband to the business.

Husband offered evidence that he did not own and had not owned King Farms. He testified that he did not own the business when he signed the antenuptial agreement and that he did not own it at the time of trial. He explained that his father was the owner of the business and that he was employed as manager of his father's business receiving $400 a week, a vehicle to use, and his health insurance as compensation. Husband further testified that he had no decision making authority in the business and that he did not even go to Wal Mart to purchase supplies for the business without his father's approval. Finally, Husband testified that the $11,451 paid to the business was a loan.

Additionally, Husband's father testified that he was the owner of King Farms. He explained that the business had been in his family for four generations and that he had owned it for "many, many years." Husband's father also testified that he had an office at King Farms and that he goes into work six days a week. He testified that he was "in full control" of the business and that he did not turn over the management of King Farms to Husband. He explained that although he intends upon his death to leave the business to Husband, he had not yet transferred the business to him. When asked why he did not file tax returns showing himself as the owner of the business, Husband's father stated that he received "wrong advice" about his taxes.

██ The trial court found that although the arrangements between the father and the son "were not quite proper," Husband's father was the sole owner of the business. While some of Wife's documentary evidence conflicted with Husband's evidence that he did not own King Farms, other evidence presented by Wife was not inconsistent with Husband's evidence. And where the evidence did conflict, the trial court chose to believe the testimony of Husband and Husband's father over certain of Wife's documentary evidence. *See Mason v. Mason,* 873 S.W.2d 631, 633 (Mo.App. E.D.1994)(where testimony at trial contradicted documentary evidence, the trial court's assessment of the credibility of the parties was crucial). An appellate court must defer to the trial court's findings even if the evidence could support a different conclusion because the trial court is in a better position to judge witness credibility, sincerity, and character and other intangibles not revealed in a transcript. *Van Natter v. Van Natter,* 988 S.W.2d 110, 113 (Mo.App. W.D.1999). The trial court's finding that Husband did not own King Farms when the antenuptial agreement was signed or at the time of trial was not against the weight of the evidence and was supported by substantial evidence. Accordingly, Husband was not required to disclose in the antenuptial

agreement anything regarding the ownership of the business.

## B. Right to Profits of King Farms

Alternatively, Wife contends that even if Husband's father was the owner of the business, the antenuptial agreement was invalid because Husband failed to disclose his expectancy with respect to the business; specifically, his right to keep any profits generated by the business. In its judgment, the trial court found that an arrangement existed between Husband and his father whereby Husband may keep whatever profit that is generated by King Farms for assisting his father in running the company. No party disputes this finding, and it was supported by substantial evidence in the record. Although neither Husband nor Husband's father testified that they had an arrangement whereby Husband may keep the profits of King Farms as remuneration for working for the business, Husband's tax returns showed that every year since 1991, Husband reported King Farms' net profit as his income.

 Husband did not disclose this income in the antenuptial agreement. The nondisclosure, however, did not destroy the validity or enforceability of the agreement. Full disclosure in an antenuptial agreement requires that each party reveal the nature and extent of their property so that the other party may make an informed decision regarding whether to waive whatever rights they would otherwise acquire in that property through the marriage. *Miles,* 977 S.W.2d at 301; *Darr,* 950 S.W.2d at 870. No absolute rule as to what constitutes sufficient disclosure exists; what is sufficient varies with the circumstances of each case. *Miles,* 977 S.W.2d at 301.

 Generally, property acquired during the marriage, including income earned by a spouse, is presumed to be marital property subject to certain exceptions. § 452.330.3, RSMo 2000; *Taylor v. Taylor,* 25 S.W.3d 634, 643 (Mo.App. W.D. 2000); *Ansley v. Ansley,* 15 S.W.3d 28, 35 (Mo.App. W.D.2000). One exception to this general rule is property excluded by a valid written agreement of the parties. § 452.330.2(4), RSMo 2000. "Property that is excluded by a valid agreement renders the property separate by rebutting the presumption that property acquired by either party after marriage is marital property." *Sprock v. Sprock,* 882 S.W.2d 183, 187 (Mo.App. W.D.1994). The antenuptial agreement in this case excluded from marital property all separate property owned by Husband and Wife at the time of the marriage; all property acquired or received separately during the marriage by either spouse whether by gift, inheritance, or otherwise; and any increases arising from their separate property. In conjunction with this provision of the agreement, Husband and Wife disclosed the property owned by each at the time of the agreement in exhibits attached to the agreement. The antenuptial agreement did not, however, manifest an intent of the parties to exclude from marital property the income earned by each during the marriage, and Husband and Wife did not disclose their incomes in the agreement. When an antenuptial agreement purports to inhibit remedies provided by statute, it should be rather strictly construed. *B.J.D. v. L.A.D.,* 23 S.W.3d 793, 800 (Mo. App. E.D.2000). Absent express language, the antenuptial agreement did not exclude from marital property income earned by Husband and Wife during the marriage. Because the agreement did not provide that the income of Husband and Wife earned during the marriage would remain their separate property, Wife did not, in signing the agreement, waive the rights

she would otherwise acquire in such property. (See section II of this opinion for a discussion of Wife's rights in this property.) Husband's nondisclosure of his income, specifically the profits of King Farms, did not, therefore, adversely affect Wife's ability to make an informed decision regarding her marital rights. Thus, the nondisclosure of Husband's income did not invalidate the antenuptial agreement.

### C. Conscionability

Next, Wife claims that the trial court erred in enforcing the antenuptial agreement because it was unconscionable. An antenuptial agreement is unconscionable when "the inequality [is] so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Miles*, 977 S.W.2d at 303 (quoting *McMullin v. McMullin*, 926 S.W.2d 108, 110 (Mo.App. E.D.1996)). An antenuptial agreement may be unconscionable where it attempts to totally exclude one spouse's presumed right to marital property. *Id.* Where a spouse retains at least a share of marital property in the antenuptial agreement, the agreement is likely enforceable. *Id.*

The antenuptial agreement provided that the separate property of the parties remain separate, and that provision did result in a great disparity between the separate property set aside to each spouse. The agreement, however, did not attempt to preclude an award of marital property to Wife. The agreement was not unconscionable. The trial court did not err in enforcing the antenuptial agreement. The points are denied.

### II. DESIGNATION OF SEPARATE AND MARITAL PROPERTY

In her next point on appeal, Wife claims that the trial court erred in setting aside certain property acquired during the marriage as Husband's separate property, specifically the Gould Farm property and the American Century and Kemper Funds accounts. She also claims that the trial court erred in finding that increases in the King Farms bank accounts and business inventory during the marriage were the property of Husband's father. Wife argues that even if the antenuptial agreement was valid, Husband's income during the marriage was marital property and the assets in question were acquired with that income and, thus, were also marital property. Wife's argument is again based on the trial court's findings that an arrangement existed between Husband and his father whereby Husband may keep whatever profit that is generated by King Farms for assisting his father in running the company.

Since the property in question was acquired during the marriage, it is presumed to be marital property. *Ansley*, 15 S.W.3d at 35. Husband, as the party claiming that the property is his separate property, bears the burden of proving the property is his separate property by clear and convincing evidence. *Id.* Under the source of funds doctrine, whether property is characterized as marital or nonmarital depends on the source of funds used to purchase the property. *McGilley v. McGilley*, 951 S.W.2d 632, 638–639 (Mo. App. W.D.1997). As discussed in section IB above, the trial court found that beginning in 1991, Husband received the profits of the King Farms business as remuneration for working for the business, and this finding was supported by substantial evidence. The antenuptial agreement between Husband and Wife did not exclude from marital property the income earned by each during the marriage; thus, such income, including Husband's receipt of the King Farms profits, was marital property.

Any property acquired from the profits of King Farms, therefore, was also marital property.

The trial court first found that Gould Farm, which was acquired during the marriage, was a gift from Husband's father to Husband and Husband's son and, thus, was Husband's separate property. Wife claims that the property was acquired with Husband's income, specifically the profits from King Farms, and, thus, was marital property subject to division by the trial court. The evidence showed that Husband received an owner's draw of $400 a week from King Farms. A reasonable conclusion from this evidence is that the remaining profits from the business remained in the business. Husband's father testified that he purchased the farm with assets from his business for his son and grandson. A check for the purchase price of Gould Farm was drawn on the King Farms business checking account. The record is unclear, however, regarding whether the funds in the King Farms checking account included profits of the business at the time of the Gould Farm purchase. The case is, therefore, remanded to the trial court to determine, after presentation of additional evidence if necessary, the source of the funds used to purchase Gould Farm, specifically, if King Farms profits earned since 1991 were used to acquire the property. If profits were used to purchase Gould Farm, the property was marital and must be divided by the trial court.

The trial court next set aside as Husband's separate property a Kemper Funds account. The account had a value of approximately $101,000. Substantial evidence supports the trial court's determination regarding this account. The parties' antenuptial agreement provided that any separate property owned by a spouse at the time of the marriage and any in-creases arising from such property shall remain the separate property of each party. Husband testified that his initial and only contribution to the account was $36,000, which he rolled over from another IRA that he owned prior to the marriage, and that the remainder of the account represented an increase in the account's market value. Husband met the burden of proving that the Kemper Funds account was his separate property. The trial court did not err in setting aside the Kemper Funds account to Husband.

The trial court also set aside to Husband an American Century account worth approximately $45,000 at the time of trial. The trial court found that $1600 of the account was marital property and divided that amount equally between Husband and Wife ordering Husband to pay Wife $800. The court found that the remainder of the American Century account was Husband's separate property. Husband testified that the American Century account was acquired from three different sources and that the remainder of the account represented an increase in market value of the account. First, Husband testified that he contributed $10,000 from the proceeds of the sale of his 1988 Ford pickup, which was disclosed as his separate property in the antenuptial agreement. Second, Husband testified that he contributed $50 per month for two to three years during the marriage from his checking account. This testimony supports the trial court's finding that $1600 of the account was marital property. Finally, both Husband and Husband's father testified that Husband's father gave Husband a $2000 gift from the assets of King Farms to contribute to the account. As with the Gould Farm property, the record is unclear whether the $2000 contribution from the assets of King Farms originated from profits of the business, which are consid-

ered Husband's income. The case must, therefore, be remanded to the trial court to determine the source of the $2000 contribution to the account and, thus, the classification of that portion of the account as marital or nonmarital. Additionally, the trial court must determine what percentage of the increase in the market value of the account attributable to the original $1600 contribution found by the court to be marital and to the $2000 contribution from the assets of King Farms constitutes marital property, if at all, and divide the marital property.

■ Finally, Wife claims that the trial court erred when it found that the increases in the King Farms bank accounts and business inventory during the marriage were the property of Husband's father, as sole owner of King Farms. Again, as discussed above, any increases in the business accounts or inventory that consisted of profits of the business earned since 1991 represent Husband's income and are marital property. The case is remanded to the trial court for such determination and division of marital property.

■ Wife also alleges several additional trial court errors in this point. She claims that the trial court erred in failing to value Husband's nonmarital property and consider it in distributing and allocating marital assets and debts. Section 452.330.1 provides that the court shall consider the value of nonmarital property set apart to each spouse in dividing marital property and debts. § 452.330.1(3), RSMo 2000. Unless specifically requested, a trial court is not required to assign a specific value to separate property. *Anderson v. Anderson,* 690 S.W.2d 495, 496 (Mo.App. W.D.1985). In this case, Wife did not specifically request the trial court to value the parties' separate property. Additionally, while the trial court did not specifically assign values to Husband's nonmarital property, the record contains evidence of the value of the property in question to permit meaningful appellate review of the trial court's division of property. The trial court did not err in failing to value Husband's nonmarital property.

■ Wife also claims that the trial court erred in finding several items of property to be Husband's nonmarital property without evidence as to how the items were acquired. The items included living room furniture and accessories; bedroom furniture and accessories; kitchen furniture and dishes, appliances, pots, and pans; a 27″ television; a VCR; a stereo, records, CD's, tapes, and a CD player; and a CD stereo system in bathroom. Wife offered into evidence petitioner's exhibit 3, a property grid prepared by her and her attorney listing and designating all of the separate and marital property of the parties.[1] All of the items listed above except the CD stereo system in the bathroom were designated by Wife on the grid as Husband's separate property. Wife cannot now complain that the trial court erred in setting aside those items to Husband as his separate property. *McLaughlin v. McLaughlin,* 585 S.W.2d 567, 569 (Mo.App. E.D. 1979). While the CD stereo system in the bathroom was designated by Wife as marital property on the grid, Husband made a handwritten note on the grid on the day of trial that the CD player was a gift to him. The trial court chose to believe Husband's evidence. Substantial evidence was presented to support the trial court's division of these items of property.

---

1. The exhibit, as introduced, also contained handwritten notes made by Husband on the day of trial.

Next, Wife claims that the trial court erred in valuing her automobile, a 1995 Cutlass, and failing to note that a portion of the value was her nonmarital property. In its judgment, the trial court listed the 1995 Cutlass, valued at $8700, as marital property and awarded it to Wife. Wife designated the automobile as marital property in her exhibit 3 property grid. As with the property previously discussed and included in Wife's property grid, she cannot now complain that the trial court erred in finding that the car was marital property. *Id.* The trial court, however, failed to assign the debt associated with the automobile. Wife introduced undisputed evidence that she took a $9000 loan against the car after the parties were separated to pay her attorney's fees, rent, and expenses. The case is, therefore, remanded for the trial court for allocation of that debt. § 452.330.1, RSMo 2000.

■ Finally in this point, Wife claims that the trial court erred in failing to award a truck driven by Husband to either of the parties. On the property grid introduced into evidence by Wife, Wife listed a 2000 Ford F350 pickup truck as marital property. Husband added a handwritten note on the exhibit on the day of trial stating that the truck was not owned by either party. Additionally, Husband testified that the truck was owned by King Farms. Again, the trial court chose to believe Husband's evidence. Substantial evidence supported the trial court's finding.

### III. ATTORNEY'S FEES

In the next point on appeal, Wife claims that the trial court erred in failing to award her her attorney's fees.[2] She argues Husband should have been ordered to pay her attorney's fees totaling $11,158 because Husband breached the antenuptial agreement by failing to make a full disclosure, her economic circumstances support awarding her the fees, and Husband's conduct in failing to comply with discovery caused her to incur substantial fees.

■ Section 452.355.1 authorizes the trial court to award attorney's fees in a dissolution case after considering all relevant factors including the financial resources of both parties, the merits of the case, and the actions of the parties during the pendency of the case. § 452.355.1, RSMo 2000. The trial court, as an expert in the necessity, reasonableness, and value of fees, has great discretion in determining whether to award attorney's fees under section 452.355. *Crawford v. Crawford,* 986 S.W.2d 525, 533 (Mo.App. W.D.1999); *Leone v. Leone,* 917 S.W.2d 608, 616 (Mo. App. W.D.1996). An appellate court will not disturb the trial court's decision regarding attorney's fees unless it is so "clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Leone,* 917 S.W.2d at 616 (quoting *Meservey v. Meservey,* 841 S.W.2d 240, 248 (Mo.App. W.D.1992)).

While the trial court may have abused its discretion in failing to award Wife additional attorney's fees had the judgment of dissolution been affirmed, such is not the case. As discussed in section II of this opinion, the trial court shall reconsider on remand the classification of certain proper-

2. In her petition for dissolution of marriage filed in November 1998, Wife requested attorney's fees. During the pendency of this case, Wife filed a motion for temporary maintenance and attorney's fees. The trial court denied her request for temporary mainte- nance but awarded her $2000 in attorney's fees in June 1999. At trial in February 2000, Wife introduced an exhibit showing that she incurred an additional $11,158 in attorney's fees.

ty, and, if that property was marital, divide it between Husband and Wife. The trial court's judgment that each party shall pay their own attorney's fees is, therefore, reversed. After redetermination of Husband's and Wife's property interests, the trial court shall also reconsider Wife's request for attorney's fees. *Winter v. Winter*, 712 S.W.2d 423, 429 (Mo.App. E.D. 1986).

## IV. CHANGE OF NAME

■ In her final point on appeal, Wife claims that the trial court erred in refusing to restore her maiden name, Nelson. In her petition for dissolution of marriage, Wife requested that her maiden name be restored. The scope of discretion of a trial court to deny a petition for change of name is narrow. *Neal v. Neal*, 941 S.W.2d 501, 502 (Mo. banc 1997). The trial court's judgment of dissolution of marriage in this case did not address Wife's request, and no reason was given for the court's refusal to restore her maiden name. No substantial evidence existed to support the trial court's decision. The trial court erred in declining to restore Wife's maiden name. *Id.* at 503. The case is, therefore, also remanded to the trial court with directions to enter judgment changing Wife's name as prayed.

The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded to the trial court with directions consistent with this opinion.

All concur.

JAMES SMART, J. concurs in separate concurring opinion.

JAMES M. SMART, JR., Judge, concurring.

I write only to comment on the matter of whether the conclusion that Vernon King owned the business was against the weight of the evidence. The documentary evidence of Husband's ownership was practically overwhelming. The trial court could not disregard this evidence. This means that the trial court had to have some way of understanding the documentary evidence that was consistent with Vernon's ownership. The majority does not touch on this necessity for a theory of the evidence, and instead approaches the evidence as though this case is solely about credibility. Although I cannot say the trial court should be reversed on this issue, I think some comment must be made as to the "weight of the evidence" in this case.

In 1991, Vernon chose to set up all the documentation of the business in such a way as to place formal ownership of the business in Cordell ("Husband"). All the documentary evidence indicates that ownership of the business had been transferred from Vernon to Husband. The accountant stated that Husband signed a note for $45,000 to his father, presumably to acquire the business. The accountant seemed confused, however, saying that he does not know who owns the business. Vernon says he owns the business, and that the reason all the documents make it appear that Husband owns it is because Vernon received "wrong advice" about his taxes.

The only way I can make sense of this is to believe that the "wrong advice" Vernon received was never specifically revealed at trial, but that the trial court nevertheless perceived it. Perhaps the specter of having to pay federal estate taxes loomed over this business as Vernon reached his senior years. Rather than incorporate the business and gradually transfer shares by gift to Husband, Vernon decided to make it appear that Husband bought the business in 1991 for $45,000. On Vernon's death there would be no federal estate tax because all of the documentation would make clear that Vernon was not the owner at the time of his death.

Fortunately for Husband, the trial judge believed that, as between Vernon and Husband (and indirectly Wife), Vernon did in fact still own the business. No doubt the court believed that if there were a falling out between Vernon and Husband, and if Vernon were to insist on a reversal of all the documentation, Husband would cooperate because the reality was that Vernon "runs the show." The customers, the vendors, the employees, and the bankers all saw it as Vernon's business. Husband knew he would not get very far in attempting to wrest the business away from Vernon without Vernon's blessing.

Whether the precipitating factor here was estate taxes, as I suspect, or something else, the reality is that the trial judge understood that Vernon was trying to have the best of both worlds. I do not see how we can treat this as strictly an issue of credibility when wife points out that the documentation, with which she had nothing to do, shows overwhelmingly that Husband owned the business in 1994. Certainly, had the trial court found that that Husband owned the business, and had Husband appealed, there would be no question that we would affirm. It is harder to affirm where the trial court has found that Husband did not own the business. Although I am willing to go along with my colleagues and the trial court in this instance, because I do not think we should declare as a matter of law that the judgment was against the weight of the evidence, I believe the judgment would have been against the weight of the evidence if it were not evident that the trial court understood the nature of the "wrong advice" about taxes.

EDWIN H. SMITH, J., concurs.