

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| JALESIA MCQUEEN, | ) | No. ED103138 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 13SL-DR06185 |
| | ) | |
| JUSTIN GADBERRY, | ) | Honorable Douglas R. Beach |
| | ) | |
| Respondent. | ) | Filed:  November 15, 2016 |

Jalesia McQueen appeals the portion of the trial court's judgment dissolving her marriage to Justin Gadberry, following a bench trial, pertaining to the disposition of two pre-embryos which were frozen after McQueen and Gadberry began the process of *in vitro* fertilization ("IVF").  The trial court's judgment found the frozen pre-embryos are marital property of a *special character*, awarded the frozen pre-embryos to Gadberry and McQueen jointly, and ordered that "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]."  The trial court also found "[Gadberry's] and [McQueen's] fundamental constitutional rights to privacy and equal protection under the 14th Amendment to the U.S. Constitution will be violated if either is forced to procreate against his or her wishes."  We affirm the trial court's judgment because we do not find it erroneous under the circumstances of this case.[1]

---

[1] McQueen has filed a motion to strike a purported "Exhibit A" filed by Gadberry in this appeal ("McQueen's motion").  McQueen's motion, which was taken with the case, alleges the purported exhibit was not a part of the trial court record, is unauthenticated, and was filed in this Court without leave.  We grant McQueen's motion.

# I.    BACKGROUND

## A.    Relevant Procedural Posture and Evidence Presented at Trial

McQueen and Gadberry married on September 2, 2005. The parties separated sometime in September 2010, and on October 11, 2013, McQueen filed a petition for dissolution of marriage against Gadberry in the Circuit Court of St. Louis County. Gadberry then filed an answer and counter-petition for dissolution of marriage. The only disputed issue during the parties' divorce proceedings was the disposition of the two frozen pre-embryos.[2]

On May 19, 2014, the trial court, over Gadberry's objection and apparently *sua sponte*, appointed a guardian ad litem ("GAL") for the frozen pre-embryos.[3] The trial court subsequently held a two-day bench trial on September 10th and 12th of 2014 at which McQueen and Gadberry both testified and appeared with counsel. The GAL was also present at the trial and briefly questioned McQueen. However, the GAL did not question Gadberry, the GAL did not testify, and the GAL did not submit an oral or written recommendation regarding the disposition of the frozen pre-embryos. The following evidence was presented at trial.

### 1.    The Context of McQueen's and Gadberry's Decision to Use IVF

Early in the parties' marriage, Gadberry was in the U.S. Army and was about to be deployed to Iraq. The parties discussed their concerns about having children due to Gadberry's upcoming deployment and McQueen's age. Prior to Gadberry's deployment, he met with McQueen's doctor and produced semen specimens which were frozen.

---

[2] McQueen and Gadberry reached an agreement regarding issues relating to the legal and physical custody of their sons T.G. and B.G. (who were born during the parties' marriage), child support for T.G. and B.G., maintenance, and the distribution of certain marital property and debt.

[3] A Family Court Commissioner ("Commissioner") was initially assigned to hear this case. The Commissioner appointed the GAL, held a bench trial, and issued orders, findings, and recommendations, which were each adopted by and confirmed as the judgment of the trial court. For ease of reference, we refer simply to the trial court throughout this opinion.

Gadberry was deployed in Iraq from November 2005 through November 2006. During that timeframe, including when Gadberry was "under combat missions continuously," McQueen, who was living in the St. Louis area, initiated discussions with Gadberry about beginning the process of IVF. At some point, both parties agreed to have pre-embryos created from Gadberry's frozen semen and McQueen's eggs via IVF. The parties' decision to begin the process of IVF did not occur because McQueen had any issues relating to infertility but occurred because the parties were geographically separated as a result of Gadberry's active military service.

Sometime between February and April of 2007, while Gadberry was stationed at Fort Bragg, North Carolina and McQueen was in the St. Louis area, four pre-embryos were created from McQueen's eggs and Gadberry's sperm via IVF.[4] Gadberry testified he agreed to begin the process of IVF with McQueen, he agreed for pre-embryos to be created from his sperm and McQueen's eggs, and he intended to have children from the process. The parties do not dispute that at the time the pre-embryos were created, there was no agreement or express recording of

---

[4] In this case, there was no evidence introduced at trial with respect to the science of IVF, related scientific terms, or the division or cell stages of the frozen pre-embryos at issue in this case. However, it appears the parties do not dispute the facts or science concerning the stages of development involved in IVF. As explained in American Law Reports:

> . . . Typically the [IVF] procedure begins with hormonal stimulation of a woman's ovaries to produce multiple eggs. The eggs are then removed by laparoscopy or ultrasound-directed needle aspiration and placed in a glass dish, where sperm are introduced. Once a sperm cell fertilizes the egg, this fusion, or pre-zygote, divides until it reaches the four-to-eight cell stages, after which several pre-zygotes are transferred to the woman's uterus by a cervical catheter. If the procedure succeeds, an embryo will attach itself to the uterine wall, differentiate, and develop into a fetus. As an alternative to immediate implantation, pre-zygotes may be cryopreserved indefinitely in liquid nitrogen for later use. 'Pre-embryo' is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. It refers to the approximately 14-day period of development from fertilization to the time when the embryo implants in the uterine wall and the 'primitive streak,' the precursor to the nervous system, appears. An embryo proper develops only after implantation. The term 'frozen embryos' is a term of art denoting cryogenically preserved pre-embryos.

Elizabeth A. Trainor, Annotation, *Right of Husband, Wife, or Other Party to Custody of Frozen Embryo, Pre-embryo, or Pre-zygote in Event of Divorce, Death, or Other Circumstances*, 87 A.L.R.5th 253 (originally published in 2001). In addition, egg and sperm are collectively referred to as "gametes." *Jeter v. Mayo Clinic Arizona*, 121 P.3d 1256, 1266 (Ariz. Ct. App. 2005). Based on the foregoing, we will refer to pre-zygotes not yet transferred to a uterus as "pre-embryos" and pre-zygotes which have been cryogenically preserved as "frozen pre-embryos" for purposes of this opinion. We will also sometimes refer to individuals who provide their respective eggs and sperm for the creation of pre-embryos via IVF as "gamete providers."

the parties' intentions regarding the number of pre-embryos to be created, if or when implantation of any or all would occur, or any procedure for addressing excess or unused pre-embryos. Additionally, neither party testified Gadberry explicitly agreed to the creation of *four* pre-embryos. In fact, Gadberry testified he did not have any discussions with McQueen's doctor regarding the creation of the four pre-embryos, and McQueen testified that prior to their separation in September 2010, the parties did not discuss how many children they wanted to have.

After the four pre-embryos were created from McQueen's eggs and Gadberry's sperm via IVF, two pre-embryos were implanted in McQueen in an attempt for McQueen to have successful pregnancies and the parties to potentially have children. As a result of the implantation of the two pre-embryos, McQueen became pregnant and, in November 2007, she gave birth to twin boys, T.G. and B.G. The remaining two pre-embryos, which are the subject of this appeal, were cryogenically preserved and initially stored at a cryobank facility connected to McQueen's doctor's office in the St. Louis area.[5]

### 2. The Transfer of the Frozen Pre-Embryos to another Cryobank Facility

Sometime in 2010, the parties received a notice stating McQueen's doctor's office in the St. Louis area was closing and that the frozen pre-embryos would need to be transferred to another cryobank facility. McQueen's doctor referred McQueen and Gadberry to Fairfax Cryobank, a company which has cryobank facilities in states other than Missouri. Fairfax Cryobank required a set of documents (collectively "Documents"), including a document titled "Fairfax Cryobank Directive Regarding the Disposition of Embryos" ("Directive"), to be

---

[5] In a pre-trial deposition, McQueen testified that in 2007, the parties signed documents with the cryobank facility in the St. Louis area which provided she "would get" the frozen pre-embryos in the event the parties divorced. However, Gadberry testified at trial that he did not recall signing such documents in 2007. In addition, no written evidence was introduced at trial regarding any documents the parties allegedly signed in 2007. Moreover, McQueen does not argue on appeal that her deposition testimony concerning the alleged 2007 documents governs the outcome of this case, and therefore, any alleged agreement which took place in 2007 is not at issue in this appeal.

4

completed and returned before the frozen pre-embryos could be shipped to one of its cryobank facilities.

The parties completed all of the Documents including the Directive[6] and returned them to Fairfax Cryobank in the mail. Subsequently, the frozen pre-embryos were transferred to a storage facility in Virginia where they are currently stored.[7]

### 3. Whether the Parties Had Pre-Separation Discussions about the Disposition of the Frozen Pre-Embryos in the Event of Separation or Divorce and Each Party's Requested Relief at Trial

There is conflicting evidence whether the parties had discussions prior to their separation about what they wanted to happen with the frozen pre-embryos if they were to separate or divorce. Although McQueen testified that prior to their separation the parties did not discuss how many children they wanted to have, McQueen also testified she discussed options with Gadberry and they both decided they wanted the frozen pre-embryos to be used by McQueen if the parties were to become separated or divorced.

On the other hand, Gadberry testified he and McQueen did not discuss what they wanted to happen with the frozen pre-embryos if they were to separate or divorce. He specifically testified there were no such discussions, (1) between the time of the birth of the parties' sons T.G. and B.G. in November 2007 and May 15, 2010; (2) on May 15, 2010 or May 21, 2010 (two dates appearing on the Directive) or any time in between those two dates; or (3) any time before the parties separated in September 2010.

---

[6] The evidence adduced at trial pertaining to the parties' completion of the Documents including the Directive will be set out in detail in Section II.E.1.c. of this opinion.

[7] For purposes of this appeal only, we will assume the frozen pre-embryos were transferred to and are currently stored at the Fairfax Cryobank facility in Virginia, because this is consistent with assertions in both parties' briefs and a finding in the trial court's judgment. However, we note McQueen's pre-trial deposition testimony indicates there was some confusion as to whether the frozen pre-embryos were transferred to and stored at the Fairfax Cryobank facility in Virginia or Pennsylvania.

At trial, McQueen testified the only disposition she would deem acceptable was for the trial court to award the frozen pre-embryos to her because she wanted to implant them in an attempt to have successful pregnancies and potentially have more children with Gadberry.[8] McQueen also testified that although she and Gadberry had problems communicating since their separation and had problems co-parenting T.G. and B.G., their co-parenting of T.G. and B.G. was "getting better," and she still wanted to attempt to potentially have more children with him.

On the other hand, Gadberry requested that the trial court not award the frozen pre-embryos to McQueen because he did not want to potentially have any more children with her. Gadberry testified he did not believe he and McQueen could successfully co-parent any additional children born as a result of any implantation of the frozen pre-embryos in part because the parties had "extreme difficulties" co-parenting their sons T.G. and B.G. Further, Gadberry testified he would deem one of four options acceptable, (1) for the frozen pre-embryos to be donated to an infertile couple, preferably outside of the St. Louis area; (2) for the frozen pre-embryos to be donated to science; (3) for the frozen pre-embryos to be destroyed; or (4) for the frozen pre-embryos to remain in their status quo of being frozen and stored until the parties could agree upon a disposition.

---

[8] At various places in this opinion, this Court refers to each party's wishes regarding whether or not they want to potentially have more children "with" the other. We recognize this may not be perfect terminology under the circumstances of this case because the parties have divorced, and therefore, they are no longer "with" each other in the sense of being married or in a committed relationship. Nevertheless, our use of language referring to each party's wishes regarding whether or not they want to potentially have more children "with" the other is an attempt to recognize that if embryos were to develop and then children were to be born as a result of implantation of the remaining two pre-embryos, both parties would be the biological parents to those children.

### 4. Relevant Arguments Raised by the Parties during the Trial Court Proceedings

The parties made the following arguments during the trial court proceedings.[9] McQueen argued the trial court should award "custody" of the frozen pre-embryos to her because "Missouri law . . . recognizes an embryo is a person with protectable rights in life, health and well-being from the moment of conception onward, unless such protection is barred by the U.S. Constitution and decisional interpretation thereof. Section 1.205 [RSMo 2000]."[10] In other words, McQueen essentially argued the frozen pre-embryos should be classified as children under Missouri's dissolution statutes (Chapter 452) because they are considered persons under section 1.205. Alternatively, McQueen argued that if the frozen pre-embryos should be classified as property under Chapter 452, the Directive entered into by her and Gadberry was a valid and enforceable agreement requiring the trial court to award the frozen pre-embryos to her. McQueen also claimed the GAL did not fulfill her legal duties.

In contrast, Gadberry asserted awarding the frozen pre-embryos to McQueen, who intended to implant them, would force him to procreate against his wishes and therefore would violate his fundamental constitutional rights to privacy and equal protection under the 14th Amendment to the U.S. Constitution. Gadberry also argued that the trial court should find the Directive invalid and unenforceable under the circumstances of this case, the court should consider the frozen pre-embryos to be marital property under Chapter 452, and the court should

---

[9] All of the arguments discussed in this subsection were raised prior to the trial court's judgment, except for McQueen's claim that the GAL did not fulfill her legal duties which was raised for the first time in McQueen's post-trial motion. In their briefs, McQueen and Gadberry each make technical arguments asserting the other party failed to preserve various issues discussed in this appeal, including some of those set out in this subsection. Given the importance of the issues of first impression raised in this appeal, we assume all of the parties' arguments advanced during the trial court proceedings and to this Court are preserved for purposes of this opinion only. Similarly, we exercise our discretion to review both parties' claims. *See State v. Holcomb*, 956 S.W.2d 286, 291 (Mo. App. W.D. 1997) (finding an appellate court has discretion to review a party's claim on appeal even if a party has arguably not adequately preserved the claim).

[10] Unless otherwise indicated, all further statutory references are to RSMo 2000.

award the frozen pre-embryos to Gadberry and McQueen jointly and order that no transfer, release, or use of them shall occur without the signed authorization of both parties.

**B.      The Trial Court's Judgment and McQueen's Post-Trial Motion**

On April 13, 2015, the trial court entered a judgment finding the frozen pre-embryos are marital property of a *special character*, awarding the frozen pre-embryos to Gadberry and McQueen jointly, and ordering that "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]." In making that determination, the court made several findings of fact and conclusions of law. The trial court found the frozen pre-embryos should not be classified as children under Chapter 452; Missouri Courts and the Missouri Legislature have provided no guidance concerning issues relating to the frozen pre-embryos; and "[Gadberry's] and [McQueen's] fundamental constitutional rights to privacy and equal protection under the 14th Amendment to the U.S. Constitution will be violated if either is forced to procreate against his or her wishes." The court also made multiple findings supporting the conclusion that the Directive was not a valid and enforceable agreement between the parties which required the frozen pre-embryos to be awarded to McQueen.[11]

McQueen subsequently filed a post-trial motion raising the claims she brings in this appeal, which the trial court denied. McQueen appeals.

## II.      DISCUSSION

McQueen raises three points on appeal. In her first point, McQueen asserts the trial court erred in classifying the frozen pre-embryos as marital property of a *special character* instead of children under Chapter 452. In her second point, McQueen argues the trial court erred in failing to require the GAL to advocate for the "best interests" of the frozen pre-embryos. And in her

---

[11] The trial court's specific findings regarding the validity and enforceability of the Directive will be discussed in Section II.E.1.e. of this opinion.

third point, McQueen contends that, assuming the frozen pre-embryos were appropriately characterized as property of a *special character*, the trial court erred in awarding the frozen pre-embryos to the parties jointly.

## A. The Sensitive Yet Strictly Legal Nature of this Case

Before addressing the merits of McQueen's points on appeal, it is important to initially note that this Court recognizes the sensitive nature of this case and the differing personal beliefs it evokes – ethical, religious, and philosophical – pertaining to scientific advancements in reproductive technology, procreational choice, and the age-old and disputed question of when life begins. Those issues are not for this Court to decide. *See In re Marriage of Witten*, 672 N.W.2d 768, 774 (Iowa 2003) ("we are not called upon to determine the religious or philosophical status of [ ] fertilized eggs"). Instead, we are only required to decide whether frozen pre-embryos have the *legal* status of children under our dissolution of marriage statutes, *see id*., and whether, pursuant to our standard of review, the trial court erred in making certain rulings and entering the disposition of this case.[12]

## B. General Standard of Review

As with any court-tried case, our Court reviews a trial court's judgment in a dissolution action pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Alabach v. Alabach*, 478 S.W.3d 511, 513 (Mo. App. E.D. 2015). Accordingly, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Id*. In addition, we view the evidence and inferences therefrom in the light most favorable to the trial court's

---

[12] The issues we are required to decide in this case are difficult, in part because "[a]dvances in medical technology have far outstripped the development of legal principles to resolve the inevitable disputes arising out of the new reproductive opportunities now available." *J.B. v. M.B.*, 783 A.2d 707, 715 (N.J. 2001); *see also Kass v. Kass*, 696 N.E.2d 174, 178 (N.Y. 1998) ("[a]s science races ahead [in the area of assisted reproduction and IVF], it leaves in its trail mind-numbing . . . legal questions").

judgment and disregard all contrary evidence and inferences. *Kropf v. Jones*, 489 S.W.3d 830, 834 (Mo. App. E.D. 2015).

While an appellate court reviews questions of law de novo, "[j]udging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses." *St. Louis Police Leadership Organization v. City of St. Louis*, 484 S.W.3d 882, 888 (Mo. App. E.D. 2016); *Kropf*, 489 S.W.3d at 834 (quotations in original). Consequently, if facts relevant to a question of law are contested, we defer to the trial court's credibility determinations and assessment of the evidence. *City of St. Louis*, 484 S.W.3d at 888; *Kropf*, 489 S.W.3d at 834. Our Court is also bound by the trial court's findings of fact so long as they are supported by substantial evidence. *O'Gorman & Sandroni, P.C. v. Dodson*, 478 S.W.3d 539, 543 (Mo. App. E.D. 2015).

Finally, in reviewing a court-tried case, an appellate court is primarily concerned with the correctness of the trial court's decision rather than the route taken to reach it. *Id*. "Therefore, we are obliged to affirm if we determine that the trial court reached the correct result, regardless of whether the trial court's proffered reasons are wrong or insufficient." *Id*.

**C.** **Whether the Trial Court Erred in Classifying the Frozen Pre-Embryos as Marital Property of a Special Character Instead of Children under Chapter 452**

In McQueen's first point on appeal, she asserts the trial court erred in classifying the frozen pre-embryos as marital property of a *special character* instead of children under Chapter 452. While it is undisputed Chapter 452 does not expressly refer to frozen pre-embryos or declare they are property or children for purposes of dissolution proceedings, McQueen asserts the trial court should have classified the frozen pre-embryos as children because section 1.205,

which declares that, *inter alia*, life begins at conception, applies to frozen pre-embryos.[13]  *See* section 1.205.1(1).  In response, Gadberry contends applying section 1.205 to frozen pre-embryos would violate his constitutional right to privacy, right to be free from governmental interference, and right not to procreate.  Gadberry also maintains that the trial court properly classified the frozen pre-embryos as marital property of a *special character*.

## 1.     The Standard of Review and General Law for Point I

The parties' arguments pertaining to McQueen's first point on appeal involve issues of statutory interpretation and the constitutionality of the application of a statute, which are questions of law this Court reviews de novo.  *Matter of Adoption of E.N.C.*, 458 S.W.3d 387, 394 (Mo. App. E.D. 2014).  Our primary rule in interpreting statutes is to determine the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning.  *Bolt v. Giordano*, 310 S.W.3d 237, 242 (Mo. App. E.D. 2010).  "[I]n determining legislative intent, [a] statute is read as a whole and *in pari materia* with related sections."  *Dodson v. City Of Wentzville*, 216 S.W.3d 173, 177 (Mo. App. E.D. 2007) (quoting *Lane v. Lensmeyer*, 158 S.W.3d 218, 226 (Mo. banc 2005)).  Pursuant to the doctrine of *in pari materia*, consistent statutes relating to the same subject matter are to be

---

[13] We note that a substantial amount of statutory language in Missouri's dissolution statutes supports the conclusion the use of words "child" and "children" refer to those who have been born.  *See, e.g.*, section 452.375.2 RSMo Supp. 2012 (in determining custody in accordance with the best interests of the child, "[t]he court shall consider all relevant factors including . . . (5) *[t]he child's adjustment to the child's home, school, and community* . . . and (8) *[t]he wishes of a child as to the child's custodian*"); section 452.305.3 RSMo Supp. 2010, section 509.520.2(3) RSMo Supp. 2010, and section 509.520.3(3) RSMo Supp. 2010 (parties filing petitions or motions in a dissolution of marriage action and responding parties "shall file a confidential case filing sheet . . . which provides . . . *[t]he names, dates of birth, and Social Security numbers of any children subject to the action*"); section 452.310.2 RSMo Supp. 2010 ("[t]he petition in a proceeding for dissolution of marriage or legal separation shall set forth . . . (4) *[t]he name, age, and address of each child, and the parent with whom each child has primarily resided* for the sixty days immediately preceding the filing of the petition . . ."); section 452.310.8 RSMo Supp. 2010 (a husband or wife's "proposed parenting plan shall set forth the arrangements that the party believes to be in the best interest of the minor children and shall include . . . (1) [a] specific written schedule detailing the custody, visitation and residential time for each child with each party including . . . (c) *[t]he child's birthday* . . . (e) *[t]he times and places for transfer of the child* between the parties . . . [and] (g) [a]ppropriate times for *telephone access*") (emphasis added in all).

11

construed together as though they constitute one act, and we presume the statutes were intended to be read harmoniously. *BASF Corp. v. Director of Revenue*, 392 S.W.3d 438, 444 (Mo. banc 2012); *Lapponese v. Carts of Colorado, Inc.*, 422 S.W.3d 396, 402 (Mo. App. E.D. 2013).

**2.  McQueen's Arguments Regarding Section 1.205 and Section 188.015 RSMo Supp. 2012**

Section 1.205 provides:

1. The general assembly of this state finds that:

(1) The life of each human being begins at conception;

(2) Unborn children have protectable interests in life, health, and well-being;

(3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.

2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term "unborn children" or "unborn child" shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.

4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

(emphasis omitted).

McQueen argues the legislature intended for frozen pre-embryos to be considered children under Missouri's dissolution statutes because, (1) section 1.205.1(1) declares that "[t]he life of each human being begins at conception"; (2) language in section 1.205.2 implicitly refers to unborn children as persons; and (3) section 1.205.3 states the term "unborn children" "shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development." McQueen also relies on the

12

definitions of "unborn child" and "conception" found in section 188.015 RSMo Supp. 2012.[14]

Section 188.015(9) defines an "unborn child" as "the offspring of human beings from the moment of conception until birth and at every stage of its biological development, including the human conceptus, zygote, morula, blastocyst, embryo, and fetus[.]" Section 188.015(3) defines "conception" as "the fertilization of the ovum of a female by a sperm of a male[.]" The preceding definitions in section 188.015 apply to section 1.205 because both statutes relate to a similar subject matter, were passed on the same day and as part of the same act, and refer to the same terms. *State v. Knapp*, 843 S.W.2d 345, 347 n.2, 347-48 (Mo. banc 1992) (stating sections 1.205 and 188.015 were passed on the same day and as part of the same act and finding section 1.205 and another statute were *in pari materia* under similar reasoning).

McQueen asserts that because the frozen pre-embryos were created after her eggs were fertilized by Gadberry's sperm via IVF, the frozen pre-embryos are "human beings" and "unborn children" under sections 188.015 and 1.205 which are entitled to "protectable interests in life, health, and well-being" and "all the rights, privileges, and immunities available to other persons . . . of this state" under Chapter 452. *See* sections 1.205.1(1)-(2) and .2; sections 188.015(9) and (3). McQueen further claims that she has "protectable interests in the life, health, and well-being" of the frozen pre-embryos under Chapter 452. *See* section 1.205.1(3). McQueen's arguments only prevail if we find the language of section 1.205 applies to Chapter 452 under the circumstances of this case.

### 3.    Prior Case Law Interpreting and Applying Section 1.205 *In Utero*

Language in sections 1.205.1(2) and .2 providing "unborn children have 'protectable interests in life, health, and well-being,' and enjoy '. . . all the rights . . . of other persons . . .' [ ]

---

[14] All further statutory references to section 188.015 are to RSMo Supp. 2012, which incorporates legislative amendments through 2011 and which is the latest version of the statute.

necessarily implies that unborn children are persons . . . *for purposes of section 1.205*." *Knapp*, 843 S.W.2d at 347 (quoting sections 1.205.1(2) and .2) (emphasis omitted and added). In addition, "[r]eading all subsections of section 1.205 together and considering especially the express language of [1.205.2] that '. . . the laws of this state shall be interpreted and construed . . .,' it is clear that section 1.205 is intended to apply to at least some other statutes." *Knapp*, 843 S.W.2d at 347 (quoting section 1.205.2). Nevertheless, the extent to which language in section 1.205 might be used to interpret other state statutes is something which can only be determined by Missouri Courts based on the circumstances of each case. *Webster v. Reproductive Health Services*, 492 U.S. 490, 504, 506-07 (1989).

Missouri Courts have interpreted language in section 1.205 to mean that a fetus *in utero*, defined as a stage of biological development inside a woman's uterus, is considered a person for purposes of applying criminal and civil liability statutes against third parties for causing the death of an unborn fetus. *See State v. Wade*, 232 S.W.3d 663, 665 (Mo. App. W.D. 2007); *Bailey v. State*, 191 S.W.3d 52, 54-55 (Mo. App. E.D. 2005); *see also* section 188.015(9) (defining unborn child as a stage of biological development including a fetus); *Webster's New World College Dictionary* 764 (5th ed. 2014) (defining "*in utero*" as "in, within, or while inside the uterus").[15]

Further, Courts have held that interpreting section 1.205 to apply to criminal and civil liability statutes against third parties in cases where there is the death of an unborn fetus, *in*

---

[15] *See also Connor v. Monkem Co., Inc.*, 898 S.W.2d 89, 89-90, 92 (Mo. banc 1995) (interpreting language in section 1.205 to mean a fetus *in utero* is considered a person for purposes of wrongful death statute); *Knapp*, 843 S.W.2d at 346-50 (interpreting language in section 1.205 to mean a fetus *in utero* is considered a person for purposes of involuntary manslaughter statute); *State v. Rollen*, 133 S.W.3d 57, 58, 61-64 (Mo. App. E.D. 2003) (interpreting language in section 1.205 to mean a fetus *in utero* is considered a person for purposes of felony murder in the second degree statute); *Holcomb*, 956 S.W.2d at 289-90 (interpreting language in section 1.205 to mean a fetus *in utero* is considered a person for purposes of first-degree murder statute); *see also State v. Kenney*, 973 S.W.2d 536, 539, 544-45 (Mo. App. W.D. 1998) (interpreting language in section 1.205 to mean a fetus *in utero* is considered a person for purposes of first-degree assault statute) (overruled on other grounds by *State v. Withrow*, 8 S.W.3d 75, 80, 80 n.5 (Mo. banc 1999)).

*utero*, is not contrary to U.S. Supreme Court precedent, specifically *Roe v. Wade*, 410 U.S. 113 (1973).  *See Webster*, 492 U.S. at 491, 506 (interpreting section 1.205 to offer protections to unborn children in tort law is permissible under *Roe*); *Bailey*, 191 S.W.3d at 53, 55 and *State v. Rollen*, 133 S.W.3d 57, 58, 61, 63 (Mo. App. E.D. 2003) and *State v. Holcomb*, 956 S.W.2d 286, 289-93 (Mo. App. W.D. 1997) (all rejecting defendants' arguments that interpreting section 1.205 to mean a fetus *in utero* is a person for criminal statutes is contrary to *Roe*).

**4.      The Unique Circumstances of this Case and Whether Section 1.205 Constitutionally Applies to Frozen Pre-Embryos *In Vitro***

Unlike prior cases interpreting section 1.205, the circumstances of this case do not involve a stage of biological development *in utero* or the application of section 1.205 to uninvolved third parties.  Instead, this case involves frozen pre-embryos *in vitro*, which are outside of McQueen's uterus and cryogenically preserved and stored in an artificial environment. *See Webster's New World College Dictionary* 765 (5th ed. 2014) (defining "in vitro" as "outside or isolated from the living organism and in a test tube or other artificial environment"); *see also* 87 A.L.R.5th 253 set out in footnote 4 (describing the beginning stages of IVF and cryopreservation).  Additionally, this case involves circumstances where one of the individuals who provided their respective eggs or sperm for purposes of IVF (Gadberry) does not want the frozen pre-embryos used to potentially have any more children.  Further, Gadberry claims that allowing McQueen to use the frozen pre-embryos contrary to his wishes would violate his constitutional rights.  Whether the legislature's declarations in section 1.205, including that life begins at conception/fertilization, constitutionally apply to frozen pre-embryos and whether frozen pre-embryos should be considered "children" under Missouri's dissolution statutes are issues of first impression.

We initially consider the Missouri Supreme Court's discussion of the concept of *in pari materia* in *Connor v. Monkem Co., Inc.* and section 1.205 as a whole.  *Connor*, 898 S.W.2d 89,

15

92, 92 n.8 (Mo. banc 1995); *see City of Wentzville*, 216 S.W.3d at 177 (in determining legislative intent, we read a statute *in pari materia* with related sections *and* read the statute as a whole). In *Connor*, a majority of the Missouri Supreme Court held a natural parent can bring a wrongful death claim against a third party for the death of a non-viable fetus *in utero*. 898 S.W.2d at 90-94.

In making that holding, the 4-3 Court stated, "[s]ection 1.205[.2] [ ] sets out the intention of the general assembly that Missouri courts should read all Missouri statutes *in pari materia* with this section." *Id*. at 92. However, the majority also stated:

> Section 1.205[.2] expressly acknowledges that it . . . is subject to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court. No party here has raised any such issue in regard to their own, or a derivative, constitutional right.

*Connor*, 898 S.W.2d at 92 n.8.

Reconciling and giving meaning to all of the preceding statements in *Connor*, we hold Missouri Courts should read all Missouri statutes *in pari materia* (harmoniously) with section 1.205 so long as such a reading does not violate a party's constitutional right afforded to him or her by the U.S. Constitution and decisional interpretations thereof by the U.S. Supreme Court.[16] *See Connor*, 898 S.W.2d at 92, 92 n.8; *Lapponese*, 422 S.W.3d at 402. This holding is consistent with reading section 1.205 as a whole and considering the express language in section 1.205.2, which provides:

> . . . the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, *subject* only *to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court . . ..*"

---

[16] The plain and ordinary meaning of section 1.205 reflects it should also not be read *in pari materia* with other Missouri statutes when there are "specific provisions to the contrary in the statutes and constitution of this state." Section 1.205.2.

16

(emphasis added).

In other words, the declarations of the Legislature in section 1.205 that life begins at conception, and which attempt to assign privileges and rights to various stages of biological development, "cannot be viewed in a vacuum" and "[are] not absolute"; rather, they must be construed "in the total context of section 1.205 and in the light of . . . the continuing holdings of the Supreme Court of the United States." *State v. O'Brien*, 784 S.W.2d 187, 191 (Mo. App. E.D. 1989). When so construed, the Legislature's declarations are qualified by, and subject to, the decisions of the U.S. Supreme Court, including but not limited to holdings that a woman's right to an abortion remains a constitutionally protected right. *See id*.

In this case, Gadberry claims that applying the Legislature's declarations in section 1.205, including that life begins at conception/fertilization, to the frozen pre-embryos would violate his fundamental constitutional rights recognized in a line of U.S. Supreme Court cases, specifically, his constitutional right to privacy, right to be free from governmental interference, and right not to procreate. For the reasons discussed below, we agree.

### a. Relevant U.S. Supreme Court Precedent and Interpretation Thereof

The right to privacy is not explicitly mentioned in the U.S. Constitution; however, in a line of decisions going back to the late 1800's, the U.S. Supreme Court "has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." *Roe*, 410 U.S. at 152. The roots of the right to privacy are found in the penumbras of the Bill of Rights and in various amendments to the U.S. Constitution, including the Fourteenth Amendment's concept of personal liberty and restrictions upon state action. *Id*. at 152-53; *see Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); U.S. Const. amend. XIV, section 1 ("[n]o [s]tate shall . . . deprive any person of life, liberty, or property, without due process of law"). The right of privacy inherent in the U.S. Constitution's concept of personal liberty has

17

been referred to as an individual's "right to be let alone" from the government and "the most comprehensive of rights." *Davis v. Davis*, 842 S.W.2d 588, 599 (Tenn. 1992) (quoting *Olmstead v. U.S.*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

The right of personal privacy extends to intimate activities and decisions relating to marriage, procreation, contraception, and family relationships. *Roe*, 410 U.S. at 152. The decision whether or not to use contraception, to avoid procreation, is protected by and "concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees." *Griswold v. Connecticut*, 381 U.S. 479, 484-86 (1965). Moreover, "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). In sum, U.S. Supreme Court decisions interpreting the U.S. Constitution provide a citizen's fundamental, individual right to procreational autonomy is inherent in the U.S. Constitution's concept of personal liberty and that a citizen has the right to be free from governmental interference with his or her procreational decisions. *J.B. v. M.B.*, 783 A.2d 707, 715-16 (N.J. 2001); *Davis*, 842 S.W.2d at 598-99, 600-01. These rights have been reaffirmed as recently as 2015 in *Obergefell v. Hodges*, in which the Supreme Court held "[c]hoices concerning contraception, family relationships, procreation, and childrearing" "are protected by the Constitution" and are "among the most intimate [decisions] that an individual can make." 135 S.Ct. 2584, 2599.

As explained by the Tennessee Supreme Court in *Davis*, another case involving a dispute over the disposition of frozen pre-embryos in a dissolution proceeding, "the right of procreational autonomy is composed of two rights of equal significance – the right to procreate and the right to avoid procreation." 842 S.W.2d at 589, 592, 601. In addition, "[t]he equivalence

18

of and inherent tension between these two interests are nowhere more evident than in the context of [pre-embryos created via IVF]." *Id*. at 591-92, 601.

Furthermore, where the disposition of frozen pre-embryos are in dispute, and therefore, only the beginning stages of IVF have taken place and a pre-embryo has not been transferred to and implanted in a woman's uterus, "[n]one of the concerns about a woman's bodily integrity that have previously precluded men from controlling abortion decisions is applicable [ ]." *Id*. at 601.[17] This is because the U.S. Supreme Court has recognized that when a woman is pregnant, her constitutional right to terminate the pregnancy is grounded in her liberty and privacy interests in procreative freedom *and* her basic right to bodily integrity. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 857 (1992) (referring to *Roe* as not only a rule "of personal autonomy and bodily integrity" but also "an exemplar of *Griswold* liberty").

Importantly, "constitutional developments [after *Roe*] have neither disturbed, nor do they threaten to diminish, the scope of recognized protection accorded to the liberty relating to . . . decisions about whether or not to beget or bear a child." *Id*. Accordingly, where a woman is not pregnant, both gamete providers involved in the beginning stages of IVF "stand on the brink of potential parenthood," and the woman and man "must be seen as entirely equivalent gamete providers," each of whom have a fundamental, individual right to procreational autonomy. *Davis*, 842 S.W.2d at 600-01, 603. The existence of this right to procreational autonomy necessarily dictates that decisions affecting the gamete providers' individual reproductive status rests in the gamete providers alone. *Id*. at 602. Further, no other third party or entity, including a legislature or court, has an interest sufficient to permit interference with the gamete providers'

---

[17] *See Davis*, 842 S.W.2d at 601 n.24 ("[i]nasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between [her and the man], the balance weighs in her favor") (quoting *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 71 (1976)); *see also Danforth*, 428 U.S. at 69 ("the [s]tate cannot delegate to a spouse a veto power which the state itself is absolutely and totally prohibited from exercising during the first trimester of pregnancy").

decision to continue, terminate, or suspend the IVF process, "because no one else bears the consequences of these decisions in the way that the gamete providers do." *Id.*

When, as in this case, one party wishes to continue the IVF process, the other does not, frozen pre-embryos remain in storage, and a court determines there is no valid and enforceable agreement between the parties concerning the disposition of the frozen pre-embryos upon divorce,[18] courts of other states have resolved the dispute by balancing the relative interests of the parties in using or not using the frozen pre-embryos. *J.B.*, 783 A.2d at 708, 712-14, 716-17; *Davis*, 842 S.W.2d at 589, 590, 603-04. Because this approach takes into account each party's right of procreational autonomy and the circumstances of each particular case, we find it relevant to our consideration of whether an application of section 1.205 to Missouri's dissolution statutes would be contrary to U.S. Supreme Court decisions interpreting the U.S. Constitution. *See J.B.*, 783 A.2d at 716-17; *Davis*, 842 S.W.2d at 603-04.

### b. Application of Constitutional Principles to the Facts of this Case

We first consider each of the parties' positions and interests under the circumstances of this case.

### i. The Parties' Positions and Interests

The parties' decision to begin the process of IVF did not occur because McQueen had any issues relating to infertility but occurred because the parties were geographically separated as a result of Gadberry's active military service. After Gadberry agreed for two pre-embryos partially consisting of his sperm and partially consisting of McQueen's eggs to be implanted in McQueen, McQueen had successful pregnancies and gave birth to T.G. and B.G. In addition,

---

[18] See Section II.E.1. below, where we affirm the trial court's conclusion that there was no valid and enforceable agreement between McQueen and Gadberry concerning the disposition of the frozen pre-embryos upon divorce under the circumstances of this case.

20

McQueen had another successful pregnancy and gave birth to a third child, conceived through traditional means with a man other than Gadberry, after the parties separated.

McQueen wishes to continue the IVF process with respect to the frozen pre-embryos and implant them in an attempt to have successful pregnancies and potentially have more children with Gadberry, and she testified this is the only disposition she would deem acceptable. McQueen also testified that although she and Gadberry had problems communicating since their separation and had problems co-parenting T.G. and B.G., their co-parenting of T.G. and B.G. was "getting better," and she still wanted to attempt to potentially have more children with him.

Gadberry requested that the trial court not award the frozen pre-embryos to McQueen because he did not want to potentially have any more children with her. Gadberry testified he did not believe he and McQueen could successfully co-parent any additional children born as a result of any implantation of the frozen pre-embryos in part because the parties had "extreme difficulties" co-parenting their sons T.G. and B.G. Gadberry also testified he would deem one of four options acceptable, (1) for the frozen pre-embryos to be donated to an infertile couple, preferably outside of the St. Louis area; (2) for the frozen pre-embryos to be donated to science; (3) for the frozen pre-embryos to be destroyed; or (4) for the frozen pre-embryos to remain in their status quo of being frozen and stored until the parties could agree upon a disposition.

### ii.    Analysis

We balance the interests of the parties in this case because the frozen pre-embryos are still *in vitro* and have not been transferred to or implanted in McQueen's uterus, and therefore, the disposition of the frozen pre-embryos does not implicate McQueen's right to bodily integrity in the area of reproductive choice under *Roe* which would outweigh any of Gadberry's interests in avoiding parenthood. *See Casey*, 505 U.S. at 857; *Danforth*, 428 U.S. at 69, 71; *Davis*, 842 S.W.2d at 601, 601 n.24. Further, McQueen and Gadberry both "stand on the brink of potential

21

parenthood," and, because McQueen is not pregnant, McQueen and Gadberry "must be seen as entirely equivalent gamete providers," each of whom have a fundamental, individual right to procreational autonomy. *Davis*, 842 S.W.2d at 600-01, 603.

Although McQueen has a right to procreate, that does not mean she has a right to procreate *with Gadberry* by implanting the frozen pre-embryos which contain his genetic material. As previously discussed, the parties did not begin the process of IVF because McQueen had any infertility issues and McQueen has been able to achieve parenthood.[19] Perhaps most importantly, the trial court's disposition in this case does not completely foreclose the possibility of McQueen implanting the frozen pre-embryos and achieving parenthood by their use at some point in the future. The trial court did not order the frozen pre-embryos to be destroyed, donated to another couple, or donated for purposes of scientific research; instead, the trial court awarded the frozen pre-embryos to McQueen and Gadberry jointly and ordered "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]." Pursuant to the terms of the court's judgment, McQueen

---

[19] Therefore, this case can be distinguished from those where appellate courts in other states have upheld a trial court's award of frozen pre-embryos to a woman who intended to implant them because the parties' decision to begin the process of IVF was due to the woman's anticipated infertility and the frozen pre-embryos were the woman's last and only chance at achieving parenthood. *See Szafranski v. Dunston*, 34 N.E.3d 1132, 1136-38, 1148, 1161-63 (Ill. App. Ct. 2015) (upholding trial court's conclusion under balancing-of-interests test that girlfriend's interest in using frozen pre-embryos outweighed any interest boyfriend had in preventing their use where, *inter alia*, the parties agreed to create pre-embryos via IVF due to expectation girlfriend would suffer infertility as a result of chemotherapy treatment and frozen pre-embryos "represent[ed] [the girlfriend's] last and only opportunity to have a biological child with her own eggs"); *Reber v. Reiss*, 42 A.3d 1131, 1132, 1134, 1136-42 (Pa. Super. Ct. 2012) (upholding trial court's conclusion under balancing-of-interests test that "[w]ife's inability to achieve biological parenthood without the use of the pre-embryos is an interest which outweighs [h]usband's desire to avoid procreation" where, *inter alia*, the parties agreed to create pre-embryos via IVF to preserve wife's ability to conceive a child after she underwent chemotherapy treatments and frozen pre-embryos were "likely [w]ife's only opportunity to achieve biological parenthood and her best chance to achieve parenthood at all"). An application of the balancing-of-interests test could arguably favor a woman under special circumstances where the parties' decision to begin the process of IVF was due to the woman's anticipated infertility and/or the frozen pre-embryos were the woman's last and only chance at achieving parenthood. *See Davis*, 842 S.W.2d at 604. Here, however, we find an application of section 1.205, including declarations that life begins at conception/fertilization, to frozen pre-embryos and Missouri's dissolution statutes under such special circumstances would be contrary to U.S. Supreme Court decisions interpreting the U.S. Constitution because it would infringe upon the parties' constitutional right to privacy and right to be free from governmental interference. This is because, as explained in our discussion in this point, the constitutionality of section 1.205 depends on the balancing of the interests of both gamete providers, each of whom have a fundamental, individual right to procreational autonomy.

22

could implant the frozen pre-embryos at a later point in time if she and Gadberry both signed an authorization allowing her to do so, which would allow her the possibility to achieve parenthood by their use if she had a successful pregnancy and a child or children were born as a result. In other words, it cannot be said that McQueen's fundamental right to procreate would be irrevocably extinguished if she is not awarded the frozen pre-embryos in this instant proceeding.

Balanced against McQueen's right to procreate and her interest in achieving further parenthood through the use of the frozen pre-embryos is Gadberry's right not to procreate and his interest in avoiding future parenthood with McQueen. If the trial court were to award the frozen pre-embryos to McQueen as she requests, it could result in the successful implantation and gestation of the frozen pre-embryos. This possible result would impose unwanted parenthood on Gadberry, with all of its possible life-long emotional, psychological, and financial responsibilities. *See J.B.*, 783 A.2d at 717 and *Davis*, 842 S.W.2d at 603 (similarly finding).

Moreover, Gadberry's fundamental right not to procreate would be irrevocably extinguished if McQueen bears more of Gadberry's children, a situation where Gadberry would be forced to become a biological parent again, this time against his will.[20] *See J.B.*, 783 A.2d at 717 (finding a spouse's fundamental right not to procreate would be irrevocably extinguished under similar circumstances). In addition, Gadberry would be subjected to unwarranted governmental intrusion into the intimate decision of whether to potentially have more children. *See Eisenstadt*, 405 U.S. at 453 ("[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"). In contrast, the trial court's judgment – awarding the frozen pre-embryos to Gadberry and McQueen jointly,

---

[20] We are mindful that men who choose to engage in more traditional methods of procreation are sometimes subjected to "unplanned" parenthood when the woman becomes pregnant and there is a stage of development *in utero*.

23

and ordering that "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]" – subjects neither party to any unwarranted governmental intrusion but rather leaves the intimate decision of whether to potentially have more children to the parties alone.

This brings us back to the questions of whether the legislature's declarations in section 1.205, including that life begins at conception/fertilization, constitutionally apply to frozen pre-embryos and whether frozen pre-embryos should be considered "children" under Missouri's dissolution statutes. Based on the foregoing, we hold that when weighed against the interests of McQueen and Gadberry and the responsibilities inherent in parenthood, the General Assembly's declarations in section 1.205 relating to the potential life of the frozen pre-embryos are not sufficient to justify any infringement upon the freedom and privacy of Gadberry and McQueen to make their own intimate decisions. *See Davis*, 842 S.W.2d at 602 (similarly finding with respect to Tennessee's state interests). Gadberry and McQueen alone should decide whether to allow a process to continue that may result in such a dramatic change in their lives as becoming parents. *See id*. We also hold that an application of section 1.205, including declarations that life begins at conception/fertilization, to the frozen pre-embryos and to Missouri's dissolution statutes under the circumstances of this case, (1) would be contrary to U.S. Supreme Court decisions interpreting the U.S. Constitution; and (2) would violate Gadberry's constitutional right to

24

privacy, right to be free from governmental interference, and right not to procreate.[21]

Accordingly, the trial court did not err in failing to classify the frozen pre-embryos as children under Chapter 452.

**5.    The Trial Court's Classification of the Frozen Pre-Embryos as Marital Property of a Special Character**

We now turn to McQueen's argument which questions whether the trial court erred in classifying the frozen pre-embryos as marital property of a *special character*. As previously stated, it is undisputed the statutes in Chapter 452 do not expressly refer to frozen pre-embryos or declare they are property for purposes of dissolution proceedings. *See generally* Chapter 452 RSMo.

For purposes of Missouri's dissolution statutes, "marital property" is generally defined as

---

[21] We also note applying section 1.205 to pre-embryos and frozen pre-embryos would affect intimate decisions of gamete providers and related circumstances involving their doctors and cryobank facilities ("fertility workers") in situations where couples or individuals decide to destroy pre-embryos, donate them to an infertile couple, or have them cryogenically preserved and placed in long-term or indefinite storage. Perhaps most concerning, if section 1.205 were interpreted to apply to pre-embryos and frozen pre-embryos, the State could step in and mandate implantation of all pre-embryos and frozen pre-embryos, whether in the female gamete provider or in a State-chosen surrogate, even if neither gamete provider wanted to use them to potentially have children. In that situation, the State and courts would have to develop an enforcement mechanism for implantation, placing the government and courts into the province of the personal reproductive decisions of private citizens. In addition, in the area of criminal law, gamete providers or fertility workers could possibly be charged with and convicted of various forms of murder and manslaughter, assault, or child abuse for intentionally or unintentionally destroying or "injuring" pre-embryos or frozen pre-embryos and for cryogenically preserving pre-embryos and placing them in long-term or indefinite storage. *See* cases other than *Connor* discussed in footnote 15. And in the area of civil law, (1) gamete providers or fertility workers could be sued for wrongful death for destroying pre-embryos or frozen pre-embryos; and (2) there could be potential problems with a couple or individuals donating pre-embryos or frozen pre-embryos to others because donation would arguably have to be governed by Missouri's adoption statutes, Chapter 453, which are currently unequipped to regulate such forms of adoption. *See Connor*, 898 S.W.2d at 89-90, 92 (interpreting language in section 1.205 to mean a fetus *in utero* is considered a person for purposes of wrongful death statute); *see generally* Chapter 453 RSMo. We find these and other potential implications of applying the legislature's declarations in section 1.205 to pre-embryos and frozen pre-embryos are unreasonable and further support Gadberry's position and affirming the trial court's judgment. *See Rothschild v. State Tax Com'n of Missouri*, 762 S.W.2d 35, 37 (Mo. banc 1988) (in determining legislative intent, an appellate court presumes the legislature did not intend an absurd law and the court favors a construction of a statute that avoids unjust or unreasonable results). However, our findings in this footnote relating to the potential implications of applying section 1.205 to pre-embryos and frozen pre-embryos are not central to our decision nor dispositive of this appeal.

"all property acquired by either spouse subsequent to the marriage[.]" Section 452.330.2[22]; *see Taylor v. Taylor*, 12 S.W.3d 340, 344-45 (Mo. App. W.D. 2000). In addition, "property" is defined in relevant part as "[a]ny *external* thing over which the rights of . . . use . . . are exercised[.]" *Black's Law Dictionary* 1232 (7th ed. 1999) (emphasis added).

Again, this case involves frozen pre-embryos *in vitro*, which are outside of McQueen's uterus and cryogenically preserved and stored in an artificial environment; accordingly, they are external. *See Webster's New World College Dictionary* 765 (5th ed. 2014); *see also* 87 A.L.R.5th 253. Though frozen pre-embryos may never realize their biologic potential, even if implanted, they are unlike traditional forms of property or external things because they are comprised of a woman and man's genetic material, are human tissue, and have the potential to become born children. *Davis*, 842 S.W.2d at 596-97.[23] Accordingly, frozen pre-embryos are entitled to special respect. *Id.*

In this case, the trial court's judgment found the frozen pre-embryos are marital property of a *special character*, awarded the frozen pre-embryos to Gadberry and McQueen jointly, and ordered that "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]." As the main part of this ruling pertains to the parties' decision-making authority over the frozen pre-embryos created subsequent to their marriage, including but not limited to when they can exercise rights to use them, it is consistent with the broad definitions of "marital property" and "property" set out

---

[22] Section 452.330.2 sets forth five exceptions to the general definition of marital property, including "(4) [p]roperty excluded by valid written agreement of the parties[.]" In McQueen's third point on appeal, she relies on the preceding exception to argue she and Gadberry entered into a valid and enforceable agreement requiring the trial court to award the frozen pre-embryos to her. This argument, which presupposes the frozen pre-embryos should generally be classified as marital property under Chapter 452, will be discussed in detail in Section II.E.1. below, where we affirm the trial court's conclusion that there was no valid or enforceable agreement between McQueen and Gadberry concerning the disposition of the frozen pre-embryos upon divorce under the circumstances of this case.
[23] *See* also the amicus brief filed by the American Society for Reproductive Medicine, which states in relevant part, "The preembryo is due greater respect than other human tissue because of its potential to become a person and because of its symbolic meaning for many people." (citing Ethics Committee of the ASRM, *The moral and legal status of the preembryo*, 62 Fertility and Sterility 33S (Nov. 1994)).

above.  *See Witten*, 672 N.W.2d at 771, 776 and *Kass v. Kass*, 696 N.E.2d 174, 175, 179 (N.Y. 1998) (indicating that the issue in cases involving the disposition of frozen pre-embryos is determining the parties' decision-making authority over them); *In re Marriage of Dahl and Angle*, 194 P.3d 834, 838 (Or. Ct. App. 2008) (finding a similar definition of "property" to be "broad" and encompass rights relating to the disposition of frozen pre-embryos).  And to the extent the trial court's judgment denominates the frozen pre-embryos as marital property of a "special character" and essentially provides the frozen pre-embryos are to remain in their status quo of being cryogenically preserved and stored until the parties both agree in writing as to another disposition, the judgment is consistent with the principle that frozen pre-embryos are entitled to a special respect.  Therefore, we hold the trial court did not err in classifying the frozen pre-embryos as marital property of a *special character*.

### 6. Conclusion as to Point I

Based on the foregoing, the trial court did not err in classifying the frozen pre-embryos as marital property of a *special character* instead of children under Chapter 452.  Point one is denied.

### D. Whether the Trial Court Erred in Failing to Require the GAL to Advocate for the "Best Interests" of the Frozen Pre-Embryos

In her second point on appeal, McQueen argues the trial court erred in failing to require the GAL to advocate for the "best interests" of the frozen pre-embryos.[24]  The trial court appointed the GAL for the frozen pre-embryos over Gadberry's objection and apparently *sua sponte*.  The GAL was also present at the trial and briefly questioned McQueen.  However, the

---

[24] We note that a separate GAL was appointed to represent the interests of T.G. and B.G., before the parties reached an agreement relating to custody and child support of those two children.  Our discussion in this point on appeal only pertains to the GAL who was appointed for the frozen pre-embryos.

GAL did not question Gadberry, the GAL did not testify, and the GAL did not submit an oral or written recommendation regarding the disposition of the frozen pre-embryos.

Section 452.423 RSMo Supp. 2010[25] provides in relevant part:

1. In all proceedings for child custody or for dissolution of marriage or legal separation where custody, visitation, or support of a child is a contested issue, the court may appoint a guardian ad litem . . ..

. . .

4. The appointing judge shall require the guardian ad litem to faithfully discharge such guardian ad litem's duties, and upon failure to do so shall discharge such guardian ad litem and appoint another . . ..

McQueen argues the trial court did not comply with section 452.423.4 because it did not require the GAL to advocate for the "best interests" of the frozen pre-embryos. *See J.D. v. L.D.*, 478 S.W.3d 514, 518 (Mo. App. E.D. 2015) (a guardian ad litem's function is to advocate what he or she "believes to be the best interests of the child"); *Lindsey v. Lindsey*, 336 S.W.3d 487, 492 (Mo. App. E.D. 2011) ("[t]he duty of a guardian ad litem is to protect the best interests of a child") (quotations in original). Whether a trial court erred in failing to comply with a statute is a question of law which an appellate court reviews de novo. *S.L.M. v. D.L.N.*, 167 S.W.3d 736, 738 (Mo. App. W.D. 2005).

McQueen's argument that the trial court failed to comply with section 452.423.4 is premised on two related legal arguments, (1) the trial court should have classified the frozen pre-embryos as "children" under Chapter 452; and (2) therefore, the trial court's appointment of a GAL for the frozen pre-embryos was proper at the outset. *See* section 452.423.1 ("[i]n all proceedings for child custody or for dissolution of marriage or legal separation where custody, visitation, or support *of a child* is a contested issue, the court may appoint a guardian ad litem") (emphasis added).

_____

[25] All further statutory references to section 452.423 are to RSMo Supp. 2010, which incorporates legislative amendments through 2009 and which is the latest version of the statute.

Both of the preceding arguments have no merit. As noted in detail in footnote 13, a substantial amount of statutory language in Missouri's dissolution statutes supports the conclusion the use of words "child" and "children" refer to those who have been born. More importantly, as we held in Section II.C.4., the trial court did not err in failing to classify the frozen pre-embryos as children under Chapter 452. Further, because custody, visitation, or support of *children* were not contested issues in this case, the trial court did not have the authority under section 452.423.1 to appoint a GAL for the frozen pre-embryos.[26] Therefore, McQueen's argument that the trial court erred in failing to require the GAL to advocate for the "best interests" of the frozen pre-embryos has no merit. Point two is denied.

**E.      Whether the Trial Court Erred in Awarding the Frozen Pre-Embryos to the Parties Jointly**

McQueen's third and final point on appeal raises alternative arguments to those raised in her first and second points on appeal and assumes, as we held above in Section II.C., that the frozen pre-embryos were appropriately characterized as property of a *special character*. McQueen argues the trial court erred in awarding the frozen pre-embryos to the parties jointly because, (1) the Directive constitutes a valid and enforceable agreement between the parties which rendered the frozen pre-embryos to be separate property and required the trial court to award the frozen pre-embryos to McQueen, and alternatively, (2) if the frozen pre-embryos were appropriately characterized as marital property, the trial court was required to "divide" them and award them to either McQueen or Gadberry.

---

[26] Because the GAL only participated very minimally in the case, the GAL did not make a recommendation as to the disposition of the frozen pre-embryos, and the trial court's judgment was based upon its classification of the frozen pre-embryos as marital property of a *special character*, the trial court's improper appointment of a GAL for the frozen pre-embryos did not affect the outcome of the case, and therefore, it was not prejudicial. *See Blue Pool Farms, LLC v. Basler*, 239 S.W.3d 687, 690 (Mo. App. E.D. 2007) ("in determining prejudice in a [court]-tried case, the issue is whether, absent the trial error in question, the outcome of the case would have been different") (quotations in original).

1.      **Whether the Directive Constitutes a Valid and Enforceable Agreement Between The Parties**

We first examine McQueen's claim that the trial court erred in awarding the frozen pre-embryos to the parties jointly because the Directive constitutes a valid and enforceable agreement between the parties which rendered the frozen pre-embryos to be separate property and required the trial court to award the frozen pre-embryos to McQueen.

a.      **Standard of Review**

Whether a valid and enforceable agreement exists is a question of law subject to de novo review. *State ex rel. Union Pacific R. Co. v. David*, 331 S.W.3d 666, 667 (Mo. banc 2011). The classification of property as either marital or separate is also a question of law which we review de novo. *Stroh v. Stroh*, 454 S.W.3d 351, 355 (Mo. App. S.D. 2014). However, we defer to the trial court's findings of fact and credibility determinations which underlie such a classification. *Id.*; *In re Marriage of Harp*, 278 S.W.3d 681, 690 (Mo. App. S.D. 2008).

b.      **Relevant Law**

Property acquired during the marriage is presumed to be marital property, but a party may overcome this presumption if he or she shows the property is separate. *Thorp v. Thorp*, 390 S.W.3d 871, 876 (Mo. App. E.D. 2013); *see* sections 452.330.2 and .3. The burden is on the spouse who claims the property is separate to overcome the presumption of marital property and demonstrate by clear and convincing evidence that the property falls under one of the five exceptions listed in section 452.330.2. *Thorp*, 390 S.W.3d at 876; section 452.330.2. One of the exceptions listed in section 452.330.2 is property which is "excluded by valid written agreement of the parties."[27] Section 452.330.2(4). If a complaining party proves by clear and convincing evidence that the property acquired during the marriage falls under an exception set out in

---

[27] This is the only exception set forth in section 452.330.2 which McQueen argues is applicable to this case.

section 452.330.2, the property is rendered separate.  *Thorp*, 390 S.W.3d at 876; *King v. King*, 66 S.W.3d 28, 35 (Mo. App. W.D. 2001).

"Before any property can be excluded from the term 'marital property' by valid agreement of the parties under section 452.330.2(4), the evidence must clearly and unequivocally show an agreement whereby both parties intended that the property be excluded from their marital property."  *Degerinis v. Degerinis*, 724 S.W.2d 717, 720 (Mo. App. E.D. 1987).  In addition, in order for a written agreement to be considered valid and enforceable, it must, *inter alia*, be entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure.[28]  *Rivers v. Rivers*, 21 S.W.3d 117, 122 (Mo. App. W.D. 2000).  The preceding requirement relates to the circumstances surrounding the execution of the agreement, including the parties' understanding of the agreement.  *Bell v. Bell*, 360 S.W.3d 270, 279 (Mo. App. S.D. 2011).  "Full disclosure" requires a spouse to reveal the nature and extent of the property sufficiently so that the other party may make a meaningful decision whether to waive any or all of his or her rights to the property, and whether disclosure is sufficient is determined under the circumstances of each case.  *McMullin v. McMullin*, 926 S.W.2d 108, 111 (Mo. App. E.D. 1996); *Miles v. Werle*, 977 S.W.2d 297, 301 (Mo. App. W.D. 1998).

c.      **Evidence Regarding the Fairfax Cryobank Documents and Directive**

In this case, Fairfax Cryobank required a set of Documents, consisting of a total of fifteen pages, to be completed and returned before the frozen pre-embryos could be shipped to one of its cryobank facilities.  Fairfax Cryobank mailed the Documents to the home of McQueen and Gadberry sometime in early 2010.  During that time, McQueen was an attorney and Gadberry was completing his MBA.  Besides some minimal account information filled in by a Fairfax

---

[28] This standard applies to agreements entered into before and during the marriage.  *Bell v. Bell*, 360 S.W.3d 270, 279 (Mo. App. S.D. 2011); *Lipic v. Lipic*, 103 S.W.3d 144, 149 (Mo. App. E.D. 2003).

Cryobank employee prior to the Documents being sent to the parties' home, McQueen filled in virtually all of the information on the Documents including writing Gadberry's name in some places.

Within the package of Documents, there exists a three-page Directive regarding the disposition of the frozen pre-embryos. Some of McQueen's handwriting on the Directive is in a "bluish" ink,[29] while other portions of her handwriting are in black ink. In contrast, all of Gadberry's handwriting on the Directive is in black ink.

### i.    The Third Page of the Directive

The third page of the Directive is the signature page, which McQueen presented to Gadberry on May 15, 2010 and both parties signed on that date. McQueen instructed Gadberry where to sign on this page, by placing a pre-printed yellow "sign here" sticker in the appropriate place. The third page of the Directive reflects the parties' signatures were apparently notarized on May 15, 2010[30] and the parties entered into and executed the Directive "willingly, and . . . as [their] free and voluntary act for the purpose therein expressed . . . and under no constraint or undue influence." McQueen completed most of the information on the third page of the Directive, including the date and names on the notary block. Gadberry testified he did not read the Directive before he signed it because McQueen presented it to him as part of "more transfer paperwork" and the Directive was mixed in with other Documents.

---

[29] The trial court found some of McQueen's handwriting was in "bluish" ink, but this Court's review of the Documents reveals the ink could be described as "purplish." In addition, McQueen acknowledged at trial that she used a blue or purple pen when she filled out some portions of the Documents. For purposes of this appeal we will refer to some of McQueen's handwriting as being in a "bluish" ink because this reference is consistent with the trial court's finding and McQueen's testimony.

[30] This Court's review of the copies of Directive filed as part of the record on appeal arguably reflect a date of either May 5th or 15th of 2010 for the date of notarization. However, there was no testimony presented at trial regarding a May 5, 2010 date, and that date is not referred to in the trial court's judgment or the parties' briefs. Because the trial court found the signatures on the Directive "appear to be notarized on May 15, 2010," we will assume the parties' signatures were notarized on that date for purposes of this appeal.

## ii.      The Second Page of the Directive

On May 21, 2010, six days after the third page of the Directive was signed and notarized, McQueen presented the second page of the Directive to Gadberry, along with several other pages of Documents.  The second page of the Directive contains language which states in relevant part:

> In the event of separation or divorce of the partners, the embryos shall be disposed of by one of the following actions:
> (Note: write-in one choice listed above and both parties initial.)
>
> Partner Initials and Date [McQueen's initials]      5-21-10
>
> Partner Initials and Date [Gadberry's initials]      5-21-10

To the right of this section, McQueen handwrote the words, "Used by Jalesia F. McQueen." Accordingly, the second page of the Directive contains instructions that, in the event of the parties' separation or divorce, the frozen pre-embryos "shall be . . . [u]sed by Jalesia F. McQueen."

McQueen testified she handwrote the preceding words in Gadberry's presence, before he initialed the page, and it was not possible she wrote the words after the page was initialed. However, Gadberry testified he did not remember whether the handwritten words "[u]sed by Jalesia F. McQueen" were on the second page of the Directive at the time he initialed it on May 21, 2010.  Gadberry also testified that when McQueen presented the second page of the Directive and several other pages of Documents to him on May 21, 2010, she told him, "Here's some more transfer paperwork."  As McQueen did with the third page of the Directive, she instructed Gadberry where to initial on the second page of the Directive, placing a pre-printed yellow "sign here" sticker in the appropriate place.  The second page of the Directive was initialed and dated by both parties at their home on May 21, 2010, when no notary was present, and six days after the signature page of the Directive was signed and notarized.  At trial, McQueen acknowledged "the dates [on the Directive] are all off."

33

### d. Evidence as to Whether the Parties Had Pre-Separation Discussions about the Disposition of the Frozen Pre-Embryos in the Event of Separation or Divorce

There is conflicting evidence whether the parties had discussions prior to their separation about what they wanted to happen with the frozen pre-embryos if they were to separate or divorce. Although McQueen testified that prior to their separation the parties did not discuss how many children they wanted to have, McQueen also testified she discussed options with Gadberry and they both decided they wanted the frozen pre-embryos to be used by McQueen if the parties were to become separated or divorced.

On the other hand, Gadberry testified he and McQueen did not discuss what they wanted to happen with the frozen pre-embryos if they were to separate or divorce. He specifically testified there were no such discussions, (1) between the time of the birth of the parties' sons T.G. and B.G. in November 2007 and May 15, 2010; (2) on May 15, 2010 or May 21, 2010 (the two dates appearing on the Directive) or any time in between those two dates; or (3) any time before the parties separated in September 2010.

### e. The Trial Court's Findings Regarding the Documents, the Directive, and the Parties' Discussions

In this case, the trial court found that the frozen pre-embryos were marital property and they did not fall under the exception set forth in section 452.330.2(4). The trial court also made the following findings supporting the conclusion that the Directive was not a valid and enforceable agreement between the parties which required the frozen pre-embryos to be awarded to McQueen.[31] The trial court found McQueen was "in control of the [D]ocuments" and that she presented some pages of the Documents to Gadberry on May 15, 2010 and others to him on May

---

[31] Because the trial court's findings discussed in this subsection are dispositive of McQueen's first argument in her third point on appeal, we will not address other extensive findings the trial court made in support of the conclusion that the Directive was not a valid and enforceable agreement.

21, 2010.  In addition, McQueen instructed Gadberry where to sign and initial by placing "sign

here" stickers in appropriate places on the Documents.

The trial court also found McQueen handwrote nearly all of the information required on

all of the pages of the Documents.  This information included the dates and parties' names on the

notary block of the third, signature page of the Directive and the critical words on the right side

of the second page of the Directive which contains instructions that in the event of the parties'

separation or divorce, the frozen pre-embryos "shall be . . . [u]sed by Jalesia F. McQueen."  The

trial court further found that while McQueen's handwriting indicating that the frozen pre-

embryos should be used by her in the event of separation of divorce was in black ink,

McQueen's initials on that same page were in bluish ink.  Additionally, the court found that

while the third, signature page of the Directive was signed by the parties on May 15, 2010 and

appeared to be notarized on that date, the second page of the Directive purporting to contain

instructions if the parties separated or divorced was initialed by the parties on May 21, 2010.

Perhaps most importantly, the trial court also found:

[McQueen] offered no credible explanation for why the Directive was signed and
notarized on May 15, 201[0], but the critical information [on the second page of]
the Directive – directing what is to happen to the frozen [pre-]embryos in the event
of a divorce – was not completed and initialed until May 21, 2010.

[I]n view of the different dates on the[se] two most critical pages of the Directive,
[ ] the handwritten words on the right side of [the second page of the Directive
directing what is to happen to the frozen pre-embryos in the event of a divorce] may
have been filled in after [Gadberry] initialed [the page] on May 21, 2010.

When [McQueen] handed the [pages of the Directive] to [Gadberry] for [him] to
sign, she told him that the documents consisted of more transfer paperwork for the
frozen [pre-]embryos.

[Gadberry] and [McQueen] did not have a discussion at any time in May 2010 about
what would happen to the frozen [pre-]embryos in the event of a divorce.

[Gadberry] and [McQueen] had no discussions between the birth of [T.G.] and
[B.G.] in 2007 and the time [McQueen] filed for divorce . . . about what should
happen to the unused frozen [pre-]embryos in the event of a divorce.

35

Finally, the trial court also made a finding indicating Gadberry did not sign the Directive with the intent that McQueen be awarded the frozen pre-embryos in the event of a divorce.

### f. Analysis

The record reflects the trial court's findings of fact regarding the Documents, the Directive, and the parties' discussions are supported by substantial evidence. Although there was contested evidence regarding the circumstances surrounding the parties' signing and initialing of the Directive and whether the parties had any discussions concerning the disposition of the frozen pre-embryos upon separation or divorce, we defer to the trial court's credibility determinations, assessment of the evidence, and findings of fact on these issues. *See City of St. Louis*, 484 S.W.3d at 888; *Kropf*, 489 S.W.3d at 834; *O'Gorman*, 478 S.W.3d at 543. Viewing the evidence and inferences therefrom in the light most favorable to the trial court's judgment and findings, *see Kropf*, 489 S.W.3d at 834, the trial court, (1) did not find credible McQueen's testimony that she handwrote the words providing the frozen pre-embryos "shall be . . . [u]sed by Jalesia F. McQueen" in the event of separation or divorce in Gadberry's presence and before he initialed the page; (2) did not find credible McQueen's testimony that she and Gadberry discussed their options and both decided they wanted the frozen pre-embryos to be used by McQueen if the parties were to separate or divorce; but instead (3) did find credible Gadberry's testimony that he and McQueen did not discuss what they wanted to happen with the frozen pre-embryos if they were to separate or divorce. "Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses." *Id*. (quotations in original).

Based on the trial court's findings of fact and credibility determinations, the evidence does not clearly and unequivocally show that the Directive was an agreement where both McQueen and Gadberry intended the frozen pre-embryos to be excluded from their marital

36

property.  *See Degerinis*, 724 S.W.2d at 720.  Equally importantly, the trial court's findings of fact and credibility determinations regarding the circumstances surrounding the signing and initialing of the Directive indicate it was not entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure.  *See Rivers*, 21 S.W.3d at 122.  Significantly, the trial court found McQueen's handwritten words purporting to direct what is to happen to the frozen pre-embryos in the event of a divorce may have been filled in after Gadberry initialed the page and that the parties did not have any discussions regarding that issue in May 2010 or any other time before McQueen filed for divorce.  The trial court also made a finding indicating Gadberry did not sign the Directive with the intent that McQueen be awarded the frozen pre-embryos in the event of a divorce.  Based on these findings, which are supported by the evidence, there was not sufficient disclosure allowing Gadberry to make a meaningful decision whether to waive any or all of his rights to the frozen pre-embryos.  *See McMullin*, 926 S.W.2d at 111; *Miles*, 977 S.W.2d at 301; *see also J.B.*, 783 A.2d at 719 (agreements between gamete providers who are beginning the process of IVF "should not be signed . . . in a manner suggesting that the parties have not given due consideration to the disposition question"); *A.Z. v. B.Z.*, 725 N.E.2d 1051, 1052, 1057 (Mass. 2000) (reviewing court could not conclude alleged agreement represented the true intention of husband regarding disposition of frozen pre-embryos under the circumstances of the case).

Accordingly, McQueen has not proven by clear and convincing evidence that the Directive is a valid and enforceable agreement under section 452.330.2(4) which renders the frozen pre-embryos separate property to be awarded to McQueen under the circumstances of this case.  *See Thorp*, 390 S.W.3d at 876; *King*, 66 S.W.3d at 35; *Rivers*, 21 S.W.3d at 122; *Degerinis*, 724 S.W.2d at 720.  Therefore, McQueen has not overcome the presumption that the

frozen pre-embryos are marital property, and the trial court did not err in classifying the frozen

pre-embryos as marital property.[32] *See Thorp*, 390 S.W.3d at 876; sections 452.330.2 and .3.

### 2. Whether the Trial Court was Required to "Divide" the Frozen Pre-Embryos and Award Them to Either McQueen or Gadberry

We now turn to McQueen's alternative argument that the trial court erred in awarding the

frozen pre-embryos to the parties jointly because the trial court was required to "divide" them

and award them to either McQueen or Gadberry. Importantly, the trial court did not merely

award the frozen pre-embryos to the parties jointly but also found the frozen pre-embryos were

marital property of a *special character* and ordered that "no transfer, release, or use of the frozen

[pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]."

A trial court is vested with considerable discretion and "has great flexibility and far-

reaching power" in awarding marital property. *See Workman v. Workman*, 293 S.W.3d 89, 95,

96 (Mo. App. E.D. 2009). Moreover, we presume that a trial court's award of marital property is

---

[32] Our determination that McQueen has not proven by clear and convincing evidence that the Directive is a valid and enforceable agreement under the circumstances of this case is dispositive of McQueen's first argument in her third point on appeal. This Court takes no position on whether gamete providers may enter into a valid and enforceable agreement regarding the disposition of frozen pre-embryos upon divorce, an issue which involves personal and sensitive issues and may implicate a party's right to procreate and/or a party's right to avoid procreation. We note some courts in other states have given effect to valid and enforceable agreements between two gamete providers regarding the disposition of frozen pre-embryos upon divorce when the agreements evinced an intent *other than implantation* of the pre-embryos. *See In re Marriage of Dahl and Angle*, 194 P.3d at 835-42 (affirming trial court's determination giving effect to the gamete providers' valid agreement with the IVF facility at the time they began the IVF process which essentially evinced the parties' intent that frozen pre-embryos should be destroyed upon divorce); *Vitakis v. Valchine*, 987 So.2d 171, 171-72 (Fla. Dist. Ct. App. 2008) (affirming trial court's determination giving effect to gamete providers' mediated marital settlement agreement in divorce proceedings requiring the wife to provide frozen pre-embryos to the husband so he could dispose of them); *Roman v. Roman*, 193 S.W.3d 40, 41-55 (Tex. App. 2006) (reversing and remanding case to the trial court with instructions to enter an order consistent with gamete providers' agreement with the IVF facility shortly before they began the IVF process providing frozen pre-embryos were to be discarded in the event of the divorce); *Kass*, 696 N.E.2d at 175-82 (affirming appellate division's determination giving effect to gamete providers' agreement with IVF facility during beginning stages of IVF which evinced the parties' intent that frozen pre-embryos should be donated to the IVF program for approved research purposes in the event of the divorce where parties entered into subsequent "uncontested divorce" agreement affirming the disposition); *c.f. A.Z.*, 725 N.E.2d at 1057-58 ("[e]ven had the husband and the wife entered into an unambiguous agreement between themselves regarding the disposition of the frozen preembryos, we would not enforce an agreement that would compel one donor to become a parent against his or her will" because "[a]s a matter of public policy, we conclude that forced procreation is not an area amenable to judicial enforcement"); *but see Witten*, 672 N.W.2d at 771, 782 and *J.B.*, 783 A.2d at 710, 719 (adopting a rule to enforce agreements entered into by gamete providers at the time IVF has begun "subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored [frozen pre-embryos]").

correct, and the party challenging the award has the burden of overcoming that presumption. *See Sullivan v. Sullivan*, 159 S.W.3d 529, 534 (Mo. App. W.D. 2005).

Section 452.330.1 provides in relevant part that:

In a proceeding for dissolution of the marriage . . . the court . . . shall divide the marital property and marital debts in such proportions as the court deems just after considering all relevant factors including [those set out in this statute].

Multiple decisions from our Court indicate that section 452.330.1 does not prohibit courts from awarding property to parties jointly in unusual circumstances where the property cannot be justly divided. In *Murray v. Murray*, this Court explicitly held that the statutory language set out above which provides "[t]he court . . . shall divide the marital property in such proportions as the court deems just after considering all relevant factors" did not prohibit an allocation that leaves the parties as tenants in common in unusual circumstances where the property was not susceptible to a division in kind. 614 S.W.2d 554, 555-56 (Mo. App. E.D. 1981) (discussing section 452.330 RSMo 1978). In addition, in *W.E.F. v. C.J.F.*, we found the trial court did not err in awarding a complex financing instrument to the parties jointly and putting restrictions on the parties' use on the property under unusual circumstances where the property was not susceptible to a division in kind. 793 S.W.2d 446, 451, 457-59 (Mo. App. E.D. 1990). Finally, in *Glosier v. Glosier*, this Court found the trial court did not err in entering an order providing for a buy-out procedure for farm property that could result in leaving the parties each having a one-half interest in the property as tenants in common under unusual circumstances where the property was the "most substantial marital asset" and division of it would be "grossly disproportionate." 817 S.W.2d 580, 581-84 (Mo. App. E.D. 1991).

Like the circumstances and property in *Murray*, *W.E.F.*, and *Glosier*, the circumstances of this case are unusual, and the frozen pre-embryos are not easily susceptible to a just division. As previously stated, frozen pre-embryos are unlike traditional forms of property because they

39

are comprised of a woman and man's genetic material, are human tissue, and have the potential to become born children. *Davis*, 842 S.W.2d at 596-97. Moreover, the frozen pre-embryos in this case are not easily susceptible to a just division because conflicting constitutional rights are at issue (McQueen's right to procreate and Gadberry's right not to procreate), and because there is no valid and enforceable agreement between the parties regarding the disposition of the frozen pre-embryos.

The trial court's judgment – awarding the frozen pre-embryos to Gadberry and McQueen jointly, and ordering that "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]" – subjects neither party to any unwarranted governmental intrusion but rather leaves the intimate decision of whether to potentially have more children to the parties alone. We cannot find this ruling was erroneous under the circumstances of this case. *See W.E.F.*, 793 S.W.2d at 457-59 (finding it was not erroneous for the trial court to award a complex financial instrument to the parties jointly and order that "[n]either party shall have the right to alter, amend, modify or change the terms and conditions of [the instrument] . . . without the written consent of the other party" under unusual circumstances where the property was not susceptible to a division in kind) (emphasis omitted); *J.B.*, 783 A.2d at 715 (where a husband and wife are both gamete providers, the decision concerning the disposition of frozen pre-embryos "should be theirs to make"); *Davis*, 842 S.W.2d at 596, 597 ("decision-making authority regarding [frozen pre-embryos] should reside with the persons who have provided the gametes") (quotations in original).

### 3. Conclusion as to Point Three

Based on the foregoing, the trial court did not err in awarding the frozen pre-embryos to the parties jointly. Point three is denied.

40

### III. CONCLUSION

The trial court's judgment finding the frozen pre-embryos are marital property of a *special character*, awarding the frozen pre-embryos to Gadberry and McQueen jointly, and ordering that "no transfer, release, or use of the frozen [pre-]embryos shall occur without the signed authorization of both [Gadberry] and [McQueen]" is affirmed.

_____
ROBERT M. CLAYTON III, Judge

Lisa S. Van Amburg, P.J., concurs.
James M. Dowd, J., dissents in a separate opinion.



# In the Missouri Court of Appeals
## Eastern District
### DIVISION THREE

| | | |
|---|---|---|
| JALESIA MCQUEEN, | ) | No. ED103138 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 13SL-DR06185 |
| | ) | |
| JUSTIN GADBERRY, | ) | Honorable Douglas R. Beach |
| | ) | |
| Respondent. | ) | Filed: November 15, 2016 |

I respectfully dissent.

Missouri law makes one thing abundantly clear: the two embryos at issue in this case are human beings with protectable interests in life, health, and well-being. § 1.205.[1] The majority cannot square its holding with the law. Nor can it square its holding with §§ 188.010 and 188.015(3) and (10), providing that all humans, born and unborn, have the right to life; that unborn children include the offspring of human beings from the moment of conception through every stage of biological development, including the human conceptus, zygote, morula, blastocyst, embryo, and fetus; and that conception is defined as the fertilization of the ovum of a female by a sperm of a male.

It is undisputed that conception occurred in this case with respect to the two embryos at issue. The parties knowingly and voluntarily created these two embryos (in fact, they created four

---

[1] All statutory references are to RSMo 2012 unless otherwise indicated.

of them, two of which were implanted and brought to term and are now the parties' two young sons). By that act, they made the reproductive decision that the majority asserts has yet to be made. However, the majority misconstrues Missouri law's clear dictate that the lives of these embryos as human beings began at the moment of conception, and instead finds that the embryos in this case are "marital property of a special character." There is no such classification in Missouri law, in its dissolution of marriage statutes or elsewhere, *see* § 452.000 *et seq.*, and none of the Supreme Court decisions cited or reasoning provided by the majority justifies the trial court's or the majority's finding that the embryos are actually property. Indeed, the Thirteenth Amendment removes all human beings from the category of property.

Therefore, I would find that the trial court erred as a matter of law in classifying the unborn children—living human beings under Missouri law—as marital property.[2]

---

[2] The majority's characterization of the unborn children in this case as "marital property of a *special character*," in recognition of their potential to become born children, represents at least a partial acknowledgement on the part of the majority of some of the principles expressed in § 1.205. But the majority cannot have it both ways. Under § 1.205, the embryos here cannot be both property and human lives or, as the majority posits, potential human lives. Those two notions are antithetical and unsupported by Missouri law given § 1.205's clear dictates.

Also, even if the unborn children here could properly be characterized as "marital property of a special character"—i.e., even if such a category *did* exist under Missouri law—the trial court's judgment awarding them jointly to Gadberry and McQueen is *not*, as the majority claims, authorized by § 452.330.1, which provides in relevant part that "[i]n a proceeding for dissolution of the marriage . . . the court . . . *shall divide* the marital property and marital debts in such proportions as the court deems just after considering all relevant factors . . . ." (emphasis added). The majority cites in support of the trial court's joint award three Missouri cases, *Glosier v. Glosier*, 817 S.W.2d 580, 581, 583-84 (Mo.App.E.D. 1991), *W.E.F. v. C.J.F.*, 793 S.W.2d 446, 458-59 (Mo.App.E.D. 1990), and *Murray v. Murray*, 614 S.W.2d 554, 556 (Mo.App.E.D. 1981), none of which actually stands for the principle that it is within the trial court's discretion under § 452.330.1 to simply refuse to divide marital property in a dissolution case "in unusual circumstances where the property cannot be justly divided."

Instead, these cases hold that various trial courts' *divisions* of marital property held as tenants by the entirety into property held in *separately allocated proportions* as tenants in common, were not erroneous—i.e., the court did not need to take the further step of requiring that one of the parties buy out and thus extinguish the interest of the other party in the property—because these divisions were made in unusual economic circumstances or where the property was not susceptible

2

The majority rests its characterization of the embryos as property, and its denial of their right to life in this case, on the "subject to" language of subsection 2 of § 1.205, which provides that the "rights, privileges, and immunities" of "unborn children at every stage"—including the right to life, shared (under § 1.205 as applied to Missouri and federal law) with "other persons, citizens, and residents of [Missouri]"—are "subject . . . to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court." The majority concludes that the holdings of *Griswold v. Connecticut*, 381 U.S. 479 (1965), *Roe v. Wade*, 410 U.S. 113 (1973), *Eisenstadt v. Baird*, 405 U.S. 438 (1972), and other similar cases forbid us from applying in this case the declaration in § 1.205 that life begins at conception, or the statute's provision that embryos shall have the rights of citizens of Missouri.

In support of this conclusion, the majority cites merely the broad dicta—not the far more limited holdings—of these Supreme Court opinions. *See Roe v. Wade*, 410 U.S. 113, 152-3 (1973) (stating that the right of personal privacy extends to intimate activities and decisions relating to "marriage," "procreation," "contraception," and "family relationships," but holding only that a pregnant woman has a limited right to make her own decision whether to terminate her pregnancy);

---

to division in kind. *See Glosier*, 817 S.W.2d at 583-84 (awarding the parties each one-half interests in marital real property as tenants in common because it was their "most substantial marital asset," "neither party had the money necessary to buy out the interest of the other," and "the only alternative . . . would be to make a distribution of property that would have left one of the parties with a grossly disproportionate amount of marital property"); *W.E.F.*, 793 S.W.2d at 458-59 (awarding the parties an 80% interest and a 20% interest, respectively, as tenants in common of a financial instrument known as a "wrap note," where there was "no evidence that the 'wrap note' [was] 'susceptible to division in kind'" and the economics involved did not call for in-kind division because the wrap note was "subject to [a bank's] security interest" and there was "no evidence that [the party challenging the award] ha[d] sufficient current liquid assets to pay the note"); *Murray*, 614 S.W.2d at 556 (awarding the parties a 60% interest and a 40% interest, respectively, as tenants in common of the marital home, where such was "the only substantial marital asset," "neither party had sufficient money to immediately purchase the other party's interest in the property," and the property was not susceptible to division in kind).

3

*Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (proclaiming that "if the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child," but holding only that a ban on distributing contraceptives to unmarried persons is unconstitutional); *Obergefell v. Hodges*, 135 S.Ct. 2584, 2599 (2015) (declaring that "[c]hoices concerning contraception, family relationship, procreation, and childrearing . . . are protected by the Constitution" and are "among the most intimate [decisions] that an individual can make," but holding only that same-sex couples must be permitted to exercise the right to marry). None of these authorities addressed the issue here and certainly none supports the majority's finding that the embryos here are inanimate objects.

And clearly, under § 1.205 mere *dicta* are not enough to override the Missouri General Assembly's judgment that the life—and right to life—of each human being begins at conception. Nor can it be gainsaid that any reproductive decision of constitutional import remains to be made by Gadberry. He has already exercised his reproductive rights under the Constitution and Supreme Court precedent. The majority maintains that Gadberry somehow still has such a right—a right to change his mind after creating the embryos—but he does not. It is too late for him. He chose to create these two embryos and they are human lives under Missouri law.

Moreover, the only United States Supreme Court case to address the life-begins-at-conception language of § 1.205, *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 506-07 (1989), did not find that language to be in conflict with the Constitution or Supreme Court precedent, but instead left it to the courts of Missouri to decide § 1.205's applicability to other state statutes. Every Missouri court that has done so thus far has found it to be applicable to other state statutes and to be constitutional. *See Connor v. Monkem Co., Inc.*, 898 S.W.2d 89, 93

4

(Mo.banc 1995) (holding that, pursuant to § 1.205, a wrongful death claim under § 537.080 may be stated for a nonviable unborn child); *State v. Knapp*, 843 S.W.2d 345, 350 (Mo.banc 1992) (holding that the provisions of § 1.205—that unborn children are to be considered living human beings, and that they are to receive the same rights as other Missourians, subject to the Constitution and Supreme Court precedent—make unborn children persons for purposes of the involuntary manslaughter statute); *State v. Rollen*, 133 S.W.3d 57, 63 (Mo.App.E.D. 2003) (holding that that an unborn child is a person for purposes of the second-degree felony murder statute); *State v. Holcomb*, 956 S.W.2d 286, 291 (Mo.App.W.D. 1997) (holding that an unborn child is a person for purposes of the first-degree murder statute).

The majority seeks to rewrite these Missouri authorities to limit their holdings to *in utero* children only. Those authorities have no such limitation, nor does § 1.205.

Consequently, I disagree with the majority's denial of the rights of the unborn children in this case. Further, I disagree with the majority's presumption that Gadberry's interests outweigh those of his unborn children. On review, I have found that none of the Supreme Court decisions cited by the majority, nor any other decision of our nation's highest court, has established outside of the abortion context (inapplicable here) that the rights of unborn children under § 1.205 or any similar law are outweighed by the interest of a parent in not wanting to bring a child to term; and even within the abortion context, only the mother has any interest of constitutional magnitude in terminating her pregnancy and electing not to give birth to the child.

Here, Gadberry roots around for a constitutional right of a father to stand in the way of the further development of embryos he helped produce. But laying aside the conjecture about future Supreme Court decisions, the fact remains that the Court has never interpreted the Constitution in the manner suggested by Gadberry. The broad right of "procreational autonomy" that Gadberry

5

seeks to claim for himself—and that the majority finds only in a Tennessee case, *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992), that is not persuasive, applicable, or even helpful because it did not involve a law like § 1.205 (establishing that embryos are human being with the right to life) and thus did not reference or regard the interests of the cryopreserved embryos at issue therein—cannot be found in the Constitution and exists in Supreme Court precedent as yet only in dicta. The Supreme Court has not yet carved out a place in our constitutional firmament for that broader right, to be contrasted with the narrower rights heretofore set in place by actual holdings of the Court.

Finally, I have found no specific provisions in the statutes or Constitution of this state that limit the rights provided to the embryos in this case by § 1.205. I acknowledge the complexities of this case and the implications of the course of action I propose. But the law's supposed inadequacies with respect to how to deal with embryos as children in the dissolution of marriage setting does not justify this Court ignoring the clear dictates of § 1.205.

For these reasons, I would apply § 1.205 to the applicable child custody provisions and would reverse and remand for such a determination.

JAMES M. DOWD, Judge

6